UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA

    v.

ALIM J. TURNER,
    a/k/a "Baby Popoff,"
    a/k/a "BP,"
USHERY M. STEWART,
    a/k/a "U-Know,"
RONALD J. TURNER,
    a/k/a "Popoff,"
    a/k/a "RJ,"
KEDARIS T. GILMORE,
    a/k/a "Tragic,"
    a/k/a "KD,"
    a/k/a "Tra Dog,"
CHRISTOPHER A. HOUNSCHELL,
    a/k/a "Woogie,"
MAHLON T. PRATER, JR.,
    a/k/a "Lil' Moe,"
    a/k/a "Moe,"
    a/k/a "Hethtic,"
    a/k/a "Heck Dog,"
CAMARON A. BILLIPS,
    a/k/a "All-Star,"
    a/k/a "Cam,"
DEMETRIUS D. BIBBS,
    a/k/a "D Bibbs,"
    a/k/a "B,"
JYSHON FORBES,
    a/k/a "Shinny Man,"
SETH J. CURTIS,
    a/k/a "Kingpin,"
ANTOINETTE N. TURNER, and
KIANTE J. COOPER

No. 3:19-cr-151
Judges Varlan/Poplin

**UNITED STATES' CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS FILED ON SEPTEMBER 18 AND 25, 2020, UNDER
DOCUMENT NUMBERS 184, 186, 188, 189, 190, 191, 192, 193, 206, 208, 209, 212, 214,
215, 216, 217, 218, 220, 222, 223, and 224**

---

Comes now the United States of America, by and through J. Douglas Overbey, United States Attorney for the Eastern District of Tennessee, and responds in opposition to defendants' motions and accompanying memoranda.

## SUMMARY OF UNITED STATES' POSITION AS TO DEFENDANTS' MOTIONS

1. All defendants' Motions to Suppress the Wiretaps (R. 186, 188-190, 192, 209, and 212; as well as any accompanying, separately filed memoranda thereto), are collectively without merit and should be denied. All Title III Orders complied with 18 U.S.C. §§ 2510 *et seq*., and the affidavits in support of the Title III Orders demonstrated both probable cause and necessity and were sealed in accordance with Title III. (*Response, pps. 6-31*)

2. Defendant Ushery Stewart's Motion to Suppress the Search of 301 Lippencott and Motion for *Franks* Hearing (R. 191) are without merit and should be denied. The affidavit in support of the federal search warrant demonstrated the required nexus between Defendant Stewart's extensive drug trafficking and his residence, and the affidavit did not contain any knowing or recklessly false statements material to the finding of probable cause. (*Response, pps. 31-46*)

3. Defendant Mahlon Prater's Motion to Dismiss the Superseding Indictment (R. 193 and 194) is without merit and should be denied. There is no Fifth Amendment double jeopardy violation because Defendant Prater's conviction for conspiring to distribute crack cocaine in case number 3:19-cr-152 was not the same offense as the offenses the Grand Jury charged him with in case number 3:19-cr-151. (*Response, pps. 46-54*)

2

4. Defendant Kedaris Gilmore's Objection to his sentencing enhancement under 21 U.S.C. § 851 (R. 208) is a sentencing argument. The United States believes Defendant Gilmore's prior conviction for felony carjacking qualifies as a recidivist enhancement, but the United States will seek relevant *Shepard* documents to support its position and file a supplemental response. (*Response, pps. 54-55*)

5. Defendant Bibbs' Motion for Specific Impeachment Evidence (R. 214) is without merit and should be denied. The Court's Order on Discovery & Scheduling already addresses this type of evidence and any resulting disclosure obligations, all of which the United States will comply with. *See*, R. 11, Order on Discovery & Scheduling at para. E. (*Response, pps. 55-59*)

6. Defendant Bibbs' Motion for a Bill of Particulars (R. 215) is without merit and should be denied. The Superseding Indictment, along with the discovery provided, enable Defendant Bibbs to prepare his defense and avoid unfair surprise at trial. (*Response, pps. 59-65*)

7. Defendant Bibbs' Motion for Notice of Material Witnesses (R. 217) is without merit and should be denied. Defendant Bibbs' motion states no reasons why the identity and address of any confidential informant is necessary or material to his defense. (*Response, pps. 65-67*)

8. Defendant Bibbs' Motion for a Hearing on the Existence of a Conspiracy (R. 218, and separately filed memorandum in R. 219) is without merit and should be denied. The Superseding Indictment and the discovery thereto demonstrate probable cause to believe that Defendant Bibbs conspired with at least one other person to violate the federal drug laws. (*Response, pps. 67-72*)

3

9. Defendant Bibbs' Motion for Severance and Misjoinder (R. 220, his separately filed memorandum in R. 221, as well as Defendant Antoinette Turner's adoption of same, R. 224) is without merit and should be denied. The Superseding Indictment properly joins all defendants, including Defendant Bibbs and Antoinette Turner, in the drug trafficking conspiracy in Count One, and neither defendant can demonstrate a justifiable reason why he/she – or any count – should be severed from the Superseding Indictment. (*Response, pps. 73-78*)

10. Defendant Bibbs' Motion to Suppress the Search of 510 Gillespie (R. 222) is without merit and should be denied. The affidavit in support of the search warrant demonstrated probable cause with non-stale information and established the requisite nexus that evidence of drug trafficking would be found at the place to be searched. (*Response, **pps. 78-85***)

11. Defendant Bibbs' Motion to Suppress his un-*Mirandized* Statement (R. 223) has some merit. Specifically, because he was subject to custodial interrogation without first being advised of his *Miranda* rights, the United States will not introduce in its case-in-chief the statement Defendant Bibbs made in the cruiser after the search warrant was executed at 510 Gillespie Street. However, Defendant Bibbs' subsequent statement which he gave at the Hamilton County Sheriff's Office after knowingly and voluntarily waiving his *Miranda* rights is admissible in the government's case-in-chief. (*Response, **pps. 85-89***)

12. Defendants Ronald Turner's, Demetrius Bibbs', Mahlon Prater's, and remaining defendants joining the Motions for Early Disclosure of Rule 404(b) Evidence (R. 184, 216, 206, respectively) are collectively without merit and should be denied. The Court's Order on Discovery & Scheduling addresses the timeframe in which this evidence should be disclosed. *See*, R. 11, Order on Discovery & Scheduling at 3. (*Response, **pps. 89-90***)

4

## PROCEDURAL HISTORY

Beginning in approximately mid-2018, agents with the FBI and the KPD began investigating drug trafficking and violent crimes perpetrated by members and associates of a local set of the Vice Lords criminal street gang, known as the Unknown Ghost Vice Lords. Part of the extensive investigation included Court-authorized Title III wiretaps issued for three target telephones (TT1, TT2, and TT3) used by members of this conspiracy to commit federal drug crimes, firearms crimes, money laundering crimes, as well as other acts of violence. The target telephone numbers and dates of Court-authorized wiretaps are as follows:

- TT1 (865-888-3689) was tapped from on or about March 26, 2019 to on or about April 24, 2019, and was authorized by Judge Varlan;

- TT2 (865-455-0315) was tapped from on or about June 6, 2019 to on or about July 5, 2019, and again from on or about July 26, 2019 to on or about August 6, 2019, and was authorized by Chief Judge Reeves; and

- TT3 (865-405-8465) was tapped from on or about July 26, 2019 to on or about August 3, 2019, and was authorized by Chief Judge Reeves.

On September 4, 2019, the Grand Jury returned a one-count indictment, alleging a 50-gram or more methamphetamine trafficking conspiracy, against Defendants Alim Turner, Ronald Turner, Ushery Stewart, Kedaris Gilmore, Christopher Hounschell, and Michael Scott Stewart.[1] (R. 4, Indictment for case number 3:19-cr-151). That same day, the Grand Jury also returned a separate one-count indictment, alleging a single crack cocaine distribution conspiracy, against Defendant Prater. (R. 1, Indictment for case number 3:19-cr-152). Defendant Prater later entered a guilty plea to that single crack conspiracy in case number 3:19-cr-152 on November 22, 2019. (R. 23, Minute Entry; R. 27, Order Adopting USMJ Shirley's R&R on Plea of Guilty).

---

[1] Defendant Michael Scott Stewart entered a guilty plea on February 14, 2020. (R. 75, Minute Entry).

5

On March 3, 2020, the Grand Jury returned a multi-count Superseding Indictment against 12 defendants alleging a conspiracy to distribute 50 grams or more of methamphetamine, fentanyl, Roxicodone, Xanax, marijuana, and buprenorphine; money laundering; drug distribution; and firearms offenses. (R. 79, Superseding Indictment).[2]

1. **RESPONSE TO DEFENDANTS' MOTIONS TO SUPPRESS THE WIRETAP FOR TARGET TELEPHONES 1, 2, AND 3 (R. 186, 188, 189, 190, 192, 209, 212)**

*Legal Framework: Probable Cause, Necessity, Sealing*

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Title 18, United States Code, Section 2510 *et seq*, provides the statutory authority and framework whereby the government may seek a court order to obtain a wiretap. The Sixth Circuit has observed that "[t]he basic standards for a wiretap are similar to those for a search warrant, but there also must be strict compliance with Title III." *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir. 1988). Also, in reviewing the validity of an electronic surveillance order, reviewing courts must "accord great deference to the determinations of the issuing judge...[and] thus, the fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant." *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000).

---

[2] Defendant Curtis entered a guilty plea on June 17, 2020 (R. 151, Minute Entry), Defendant Hounschell entered a guilty plea on June 29, 2020 (R. 154, Minute Entry), and Defendant Cooper filed a plea agreement on March 26, 2020 (R. 115, Plea Agreement), but has not yet entered her plea before the district court.

All defendants named in the Superseding Indictment have made their initial appearances and arraignments and are in federal custody except Defendant Jyshon Forbes. Defendant Forbes is presently housed at the Davidson County jail awaiting trial on a first-degree murder charge. Defendant Forbes has not been transported via a *writ* to this District to make his initial appearance on the Superseding Indictment due to COVID-related concerns at the Davidson County jail.

6

## Wiretaps: Probable Cause and Staleness

To be valid, a search warrant must be based on a finding by a neutral, detached judicial officer that there is probable cause to believe that evidence will be found in the place to be searched. *United States v. Greene*, 250 F.3d 471, 478 (6th Cir. 2001). The standard of probable cause for the issuing judge is whether, given the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id*. at 232. "Certainty is not required, but rather a fair probability and something more than mere suspicion" is required. *United States v. Poulsen*, 655 F.3d 492, 504 (6th Cir. 2011). The issuing judge's probable-cause determination "will not be reversed if the record contains a 'substantial basis for his probable cause findings.'" *Id.* (quoting *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985)). Stated another way, probable cause arises when evidence in a search warrant affidavit constitutes "reasonable grounds for belief" supported by "less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990).

Applications and affidavits should be read with common sense and not in a grudging, hyper-technical fashion, *United States v. Ventresca*, 380 U.S. 102, 109 (1965), or by engaging in line-by-line scrutiny. *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004). A review of the sufficiency of a search warrant is limited to the "four corners of the affidavit." *United States v. Brooks,* 594 F.3d 488, 492 (6th Cir. 2010).

As to staleness, there is no arbitrary time limit that applies to determining staleness. *United States v. Gray*, 372 F. Supp. 2d 1025, 1040 (N.D. Ohio 2005), *aff'd,* 521 F.3d 514 (6th Cir. 2008) (citing *United States v. Greene,* 250 F.3d 471, 480–81 (6th Cir. 2001). Instead of "measuring

7

staleness solely by counting the days on a calendar," courts must also concern themselves with the following variables: (1) the character of the crime (chance encounter in the night or regenerating conspiracy?), (2) the criminal (nomadic or entrenched?), (3) the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), (4) the place to be searched (mere criminal forum of convenience or secure operational base?). *United States v. Harris*, 255 F.3d 288, 299 n. 3 (6th Cir.2001).

"Where the facts adduced to support probable cause describe a course or pattern of ongoing and continuous criminality, the passage of time between the occurrence of the facts set forth in the affidavit and the submission of the affidavit itself loses significance." *United States v. Urban*, 404 F.3d 754, 774 (3d Cir. 2005). Stated another way, "evidence of ongoing criminal activity will generally defeat a claim of staleness." *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001). Even if the information leading to probable cause is stale, "where recent information corroborates otherwise stale information, probable cause may be found." *United States v. Spikes*, 158 F.3d 913, 924 (6th Cir. 1998).

### **Wiretaps: Necessity Requirement**

Under Title III, a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," and the court may authorize interception only after a determination that this standard has been met. 18 U.S.C. § 2518(1)(c), (3)(c). This requirement is designed to protect against the impermissible use of a wiretap "as the initial step in a criminal investigation." *Alfano*, 838 F.2d at 163 (citing *United States v. Giordano*, 416 U.S. 505, 515 (1974)).

Investigators are only required to "give serious consideration to the non-wiretap techniques prior to applying for wiretap authority," and to inform the issuing court of "the reasons for the

8

investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Alfano*, 838 F.2d at 163–64. "[N]ecessity must be shown only for the investigation as a whole, not for each interceptee or target. *United States v. Wright*, 635 F. App'x 162, 172 (6th Cir. 2015).

The purpose of the necessity requirement "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *Corrado*, 227 F.3d at 539 (quoting *United States v. Landmesser,* 553 F.2d 17, 20 (6th Cir. 1977)). Furthermore, the Sixth Circuit recognized that "the mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance." *United States v. Stewart,* 306 F.3d 295, 305 (6th Cir. 2002). Additionally, the Sixth Circuit observed that "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." *Id.* The Court need not conduct "a hyper-technical and speculative analysis" of whether other investigative techniques might have been effective, but instead should examine the affidavit using "a practical and common sense" approach. *Wright*, 635 F.App'x. at 167-68.

Finally, in reviewing the validity of a wiretap order, reviewing courts must "accord great deference to the determinations of the issuing judge." *Corrado*, 227 F.3d at 539; *see also Alfano* 838 F.2d at 162. Indeed, the fact that "a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant." *Id*. "[A] wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this presumption." *United States v. Quintana*, 70 F.3d 1167, 1169 (10th Cir.1995); *see also United States v. Feldman*, 606 F.2d 673, 679 n. 11 (6th Cir.1979) ("It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying

9

suppression."); *United States v. Kelley*, 596 F. Supp. 2d 1132, 1143 (E.D. Tenn. 2009), *aff'd,* 459 F. App'x 527 (6th Cir. 2012).

**Wiretaps: Sealing Requirement**

"Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." 18 U.S.C. § 2518(8)(a). Under § 2518(8)(a), "immediately" means "within one or two days." *United States v. Wilkinson*, 53 F.3d 757, 759 (6th Cir. 1995). If a recording is not sealed "immediately," the government must provide a "satisfactory explanation" for why it was not, in order for the recording to be admissible. *Id.* (quoting § 2518(8)(a)). The purpose of the sealing requirement is to help protect the authenticity and reliability of the intercepted recordings and to limit "the Government's opportunity to alter the recordings." *Wilkinson*, 53 F.3d at 759 (quoting *United States v. Ojeda Rios,* 495 U.S. 257, 263 (1990)). The longer the delay before an intercepted recording is sealed, the greater the danger of adulteration. *Id.* (quoting *United States v. Mora,* 821 F.2d 860, 868 (1st Cir.1987)).

"In general, explanations have been ruled satisfactory where the government advanced a bona fide reason, there was no reason to believe there was any deliberate flouting of the Title III requirements, no reason to doubt the tapes' integrity, and no basis for inferring any other prejudice to the defendants." *United States v. Maldonado-Rivera*, 922 F.2d 934, 950 (2d Cir. 1990) (*see also Wilkinson*, 53 F.3d at 760, citing to *Madonado-Rivera*.). "Bona fide administrative obstacles may provide an acceptable excuse." *Maldonado-Rivera*, 922 F.2d at 950; *see also United States v. McGrath*, 622 F.2d 36, 43 (2d Cir. 1980) (an explanation that the tapes or discs had to be transported and copied before they could be sealed by the issuing judge can suffice); *United States v. Robinson*, 513 F. Supp. 2d 169, 185 (M.D. Pa. 2007) (acceptable explanation when judge directs sealing on a specific day); *United States v. Reed*, 575 F.3d 900, 914 (9th Cir. 2009) ("Government

10

made the recordings immediately available to the district court. Although the actual sealing of the recordings was not always accomplished within two days, the record shows that any delay was the result of the district judge's unavailability due to a full calendar."); *United States v. Washington*, 887 F. Supp. 2d 1077, 1090 (D. Mont. 2012) (acceptable delay where wiretap had to be downloaded onto discs and shipped to the district in question).

### The Exclusionary Rule and Title III

Both the Sixth Circuit and the Supreme Court have repeatedly held that "suppression is not an automatic consequence of a Fourth Amendment violation." *Herring v. United States*, 555 U.S. 135, 136 (2009); *accord United States v. Master*, 614 F.3d 236, 242 (6th Cir. 2010) ("the decision to exclude evidence is divorced from whether a Fourth Amendment violation occurred."). The main focus is on "the efficacy of the [exclusionary] rule in deterring Fourth Amendment violations in the future." *Herring*, 555 U.S. at 141. "To trigger the exclusionary rule," the Supreme Court explained, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144.[3]

The government acknowledges that, before *Herring*, the Sixth Circuit held—contrary to decisions of the Fourth, Eighth, and Eleventh Circuits—that the good faith doctrine does not apply to Title III wiretaps. *United States v. Rice*, 478 F.3d 704, 712 (6th Cir. 2007); *but see United States v. Baranek*, 903 F.2d 1068, 1071-72 (6th Cir. 1990) (recognizing that Congress intended federal wiretap law to incorporate Fourth Amendment evidence suppression doctrines); *see also United*

---

[3] Under *Herring*, a district court must first objectively assess whether the police conduct was so "deliberate, reckless, or grossly negligent" that exclusion would meaningfully deter such conduct in the future. 555 U.S. at 144. Second, the court must weigh that conduct against the exclusionary rule's "costly toll upon truth-seeking and law enforcement objectives," including its "principal cost of . . . letting guilty and possibly dangerous defendants go free." *Id.* at 141.

11

*States v. Moore,* 41 F.3d 370, 376 (8th Cir. 1994), *cert. denied,* 514 U.S. 1121 (1995) (holding that that the *Leon* good-faith exception applied to § 2518(10)(a) of Title III); *United States v. Malekzadeh,* 855 F.2d 1492, 1497 (11th Cir. 1988), *cert. denied,* 489 U.S. 1024 (1989) (holding that the *Leon* good-faith exception applied to a warrant improperly issued under Title III); *United States v. Brewer*, 204 F. App'x 205, 208 (4th Cir. 2006) (agreeing with the Eighth and Eleventh Circuits that the good faith exception is applicable to Title III). The continuing validity of *Rice* is currently unclear, because published circuit precedent is not binding "when an intervening decision of the United States Supreme Court requires modification of [the] prior decision." *United States v. Pawlak*, 822 F.3d 902, 911 (6th Cir. 2016), *abrogated on other grounds by Beckles v. United States*, 137 S. Ct. 886 (2017). Accordingly, even if this Court were to find the Title III affidavits in this case defective in probable cause and/or necessity, suppression is not appropriate under the principles discussed in *Herring*.

### *TT1 Affidavit Demonstrated Non-Stale Probable Cause*

Defendant Prater alleges that the district judge issued the wiretap order in the absence of probable cause because, according to Prater, the affidavit contained stale information. R. 213, Memorandum. Contrary to Defendant Prater's argument, the TT1 affidavit (Ex. 1, TT1 Affidavit) demonstrated that Defendant Prater, a ranking member of the Vice Lords criminal street gang, was a drug trafficker engaged in ongoing criminality, only two months had passed since the last recorded drug sale by Defendant Prater, and Defendant Prater was communicating with known criminal associates just days before the wiretap authorization was signed by the district judge. *Id*. at ¶¶ 15, 19-20, 22-24.

The TT1 affidavit noted that a confidential source made no less than six (6) controlled buys of crack of cocaine in December of 2018 and January of 2019. *Id*. at ¶ 20. This demonstrates that Defendant Prater was a drug trafficker engaged in the repeated sales of drugs. "Where the facts

12

adduced to support probable cause describe a course or pattern of ongoing and continuous criminality, the passage of time between the occurrences of the facts set forth in the affidavit and the submission of the affidavit itself loses significance." *United States v. Urban*, 404 F.3d 754, 774 (3d Cir. 2005). Stated another way, "evidence of ongoing criminal activity will generally defeat a claim of staleness." *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001). Defendant Prater's repeated drug sales are evidence of "a pattern of ongoing and continuous criminality" and thus the short passage of time from Defendant Prater's repeated drug sales in December 2018 and January 2019, until the wiretap authorization on March 26, 2019, "loses its significance." *Urban*, 404 F.3d at 774.

Moreover, the TT1 affidavit states that Defendant Prater used TT1 on January 25, 2019, to arrange a drug sale – this was only two months prior to the wiretap authorization. There was no indication noted in the affidavit that Defendant Prater ever stopped drug trafficking during that period of time. Indeed, Defendant Prater was a member of a gang, the Unknown Ghost Vice Lords, (Ex. 1, ¶ 16), and communicated with a fellow gang member and drug dealer, Defendant Alim Turner, on March 18, 2019, just days before the wiretap was authorized. *Id.* at ¶ 24-28. Defendant Prater also communicated with another drug dealer as recently as March 21, 2019, less than a week prior to the wiretap authorization. *Id*. at ¶ 27.

In light of the above, the facts contained in the TT1 affidavit were not stale. There was evidence that Defendant Prater was selling drugs from recorded drug sales and communications with TT1 to criminal associates shortly before the TT1 wiretap was authorized. This Court should accord great deference to Judge Varlan's determination that there was probable cause supporting the TT1 affidavit. At a minimum, there was a "substantial basis" for Judge Varlan's probable cause determination, and thus his decision should not be overturned. *See United States v. Poulsen*, 655 F.3d 492, 504 (6th Cir. 2011).

*__TT2 Affidavit Demonstrated Non-Stale Probable Cause__*

Defendants similarly allege that the TT2 affidavit contained stale information and, therefore, was issued without probable cause. This argument again ignores the continuing nature of the drug trafficking conduct and gang membership related to drug trafficking described in the TT2 affidavit. This argument also ignores evidence in the TT2 affidavit that Defendant Alim Turner, a ranking member within the Vice Lords, was in contact with other gang members and another drug dealer just days before the authorization was issued. Ex. 2 at ¶¶ 35-36. Accordingly, there was probable cause supporting the government's application for a wiretap on TT2.

As stated above, this Court should accord "great deference to the determinations of the issuing judge." *Corrado*, 227 F.3d at 539. Nor should this Court reverse Chief Judge Reeves' probable cause determination if the record contains a "substantial basis" for her probable cause findings. *Poulsen*, 655 F.3d at 504. This Court should consider the totality of the circumstances when evaluating probable cause. *Illinois v. Gates*, 462 U.S. 213, 230 (1983).

Here, the lengthy TT2 affidavit demonstrated that Defendant Alim Turner was engaged in continual drug trafficking, extending over several months, and that he was in constant communication with his fellow Vice Lord gang member and drug trafficker, Defendant Ushery Stewart, during that time period. The TT2 affidavit demonstrated:

- Defendant Alim Turner was a leader in the Unknown Ghost Vice Lords gang. (Ex. 2 at ¶¶ 16, 21);

- a reliable confidential source indicated that Defendant Alim Turner "was a source of supply" that sold marijuana and other drugs. The reliable source told law enforcement that Defendant Alim Turner received marijuana by the pound in the mail. (*Id.* at ¶ 21 );

- Defendant Alim Turner had conversations with others about buying and selling drugs that stretched over several months from November 2018 – January 2019. (*Id.* at ¶¶ 22-27);

- Defendant Alim Turner discussed drug trafficking in text messages with Defendant

14

Stewart who was also a member of the Unknown Ghost Vice Lords and was also a known drug dealer in the area. (*Id.* at ¶¶ 16, 24, 25);

- while using TT2, Defendant Alim Turner maintained frequent communication with Defendant Stewart from November 2018 until right before the wiretap application was approved on June 5, 2019. During that timeframe, Turner and Stewart exchanged some 750 text messages and over 1000 phone calls, (*Id.* at ¶¶ 31-36), with the most recent text on May 28, 2019, and the most recent call on May 27, 2019. (*Id.* at ¶¶ 35, 36.). These most recent communications over TT2 were just seven (7) or eight (8) days before the wiretap was approved.

These facts supplied fresh probable cause that Defendant Alim Turner was a drug trafficker, manifesting a pattern of continued drug trafficking, and that he was using TT2 to actively facilitate that drug trafficking. "Where the facts adduced to support probable cause describe a course or pattern of ongoing and continuous criminality, the passage of time between the occurrence of the facts set forth in the affidavit and the submission of the affidavit itself loses significance." *Urban*, 404 F.3d at 774. Stated another way, "evidence of ongoing criminal activity will generally defeat a claim of staleness." *Greene*, 250 F.3d at 481 (6th Cir. 2001). Not only did a confidential source identify Defendant Alim Turner as a source of supply of marijuana, receiving pounds of marijuana in the mail, but Defendant Alim Turner himself was caught on text messages, obtained via a prior search warrant, arranging drug transactions in November and December 2018, and January 2019. Several examples were included in the TT2 affidavit and are noted below:

- November 4, 2018: Defendant Alim Turner discussed switching from selling marijuana to heroin, and wanted to buy heroin from a supplier. (Ex. 2, ¶ 23);

- November 19, 2018: Defendant Alim Turner discussed with Defendant Stewart how much meth Stewart had for sale and noted that an earlier purchase he made with STEWART for 7.4 grams was actually only 6 grams. Defendant Alim Turner also noted he was waiting on Defendant Stewart so that Turner could purchase an AK-47 type pistol. (*Id.* at ¶ 24);

- December 6/7, 2018: Defendant Alim Turner discussed a drug pick-up run to Atlanta to buy narcotics in a conversation with Defendant Stewart. Defendant Alim Turner told Defendant Stewart what price his supplier in Atlanta was charging and offered to sell Stewart the drug at "a hundred" a gram plus an additional "140." Defendants Alim Turner and Stewart also spoke on the phone during this text

15

message exchange. (*Id.* at ¶ 25);

- January 31, 2019: Defendant Alim Turner agreed to sell 3.5 grams of marijuana to an unknown person. (*Id.* at ¶27).

These messages demonstrated the continuing nature of Defendant Alim Turner's drug trafficking, and revealed his close working relationship with Defendant Stewart as they worked together to buy and sell drugs. This is the sort of "a course or pattern of ongoing and continuous criminality" that defeats a staleness argument, as noted in *Urban* and *Greene*. Moreover, Defendant Alim Turner's communications with Defendant Stewart remained constant from when they were captured discussing drug sales together in November 2018. Indeed, to the extent any probable cause had grown stale, Defendant Alim Turner's constant communication with Defendant Stewart "refreshed" the probable cause by demonstrating that Defendant Alim Turner was still frequently communicating with a fellow Vice Lord gang member and known drug trafficker as late as May 28, 2019, days before the wiretap was authorized by Chief Judge Reeves. *See United States v. Henson*, 848 F.2d 1374, 1381-82 (6th Cir. 1988) ("[W]here recent information corroborates otherwise stale information, probable cause may be found."); *United States v. Word*, 806 F.2d 658, 662 (6th Cir. 1986) (affidavit referring to a doctor's sale of drugs over four months earlier was upheld because of evidence that the crime was "of a continuing nature").

Accordingly, the TT2 affidavit demonstrated probable cause that was not stale. The affidavit made it clear that Defendant Turner was a violent, ranking member of the Vice Lords and was engaged in drug trafficking using TT2 to facilitate his drug trafficking business. Considering the great deference that should be afforded to Chief Judge Reeves' probable cause finding which, at a minimum, revealed a "substantial basis" for finding probable cause, her decision should be affirmed. *Poulsen*, 655 F.3d at 504.

16

Contrary to defendants' argument, the probable cause in the TT2 and TT3 affidavit was not stale. The affidavit demonstrated that Defendants Alim Turner and Stewart were drug traffickers engaged in ongoing criminality. The evidence supporting the TT2 and TT3 affidavit was recent, coming from a previous wiretap, and both Defendants Alim Turner and Stewart were communicating with a fellow gang members and drug traffickers over TT2 and TT3 just days before the wiretap authorization was signed by Chief Judge Reeves.

The TT2 and TT3 affidavit (Ex. 3) laid out in detail the probable cause supporting the interception of TT2 and TT3, used by Defendants Alim Turner and Stewart. The affidavit established that both Defendants Alim Turner and Stewart were drug traffickers and members of the same gang, the Unknown Ghost Vice Lords. Ex. 3 at ¶ 16. The affidavit established that a reliable confidential source told law enforcement that Defendant Alim Turner received pounds of marijuana in the mail. *Id.* at ¶ 24. The affidavit also indicated that a reliable confidential source indicated that Defendant Stewart distributed ounce quantities of methamphetamine. *Id.* at ¶ 27.

The affidavit described several drug related conversations discovered on a cellular phone that used the same telephone number as TT2 as recently as January 21, 2019. *Id.* at ¶ 25. The affidavit demonstrated that in November of 2018, Defendant Stewart fled into a bathroom at a gas station when law enforcement officers arrived at that gas station, law enforcement then found approximately 15 grams of methamphetamine and approximately 11 grams of heroin in the bathroom trashcan. *Id.* at ¶ 28. The affidavit listed communications made by Defendants Stewart and Alim Turner in which they discussed drug trafficking. These conversations occurred on June 11, 2019 (*Id.* at pg. 17, ¶ 30)[4]; June 23, 2019 (*Id.* at pg. 18, ¶ 29); June 25, 2019 (*Id.* at pg. 20, ¶

---

[4] Through a typographical error, several paragraphs were incorrectly numbered in the affidavit.

17

30); June 27, 2019 (*Id.* at ¶ 32) July 2, 2019 (*Id.* at ¶ 35); and July 5, 2019 (*Id.* at ¶ 36). These interceptions almost immediately preceded the interception authorization for TT2 and TT3 signed on July 26, 2019. This probable cause was not stale, rather, it was recent and frequent. This probable cause revealed established and continuous drug trafficking by both Defendant Alim Turner and Defendant Stewart, using the TT2 and TT3. *Greene*, 250 F.3d at 481 ("evidence of ongoing criminal activity will generally defeat a claim of staleness.") Furthermore, the affidavit noted that, as recent as July 10, 2019, TT3 was in contact with another Vice Lords drug dealer named WOOGIE, later identified as Defendant Hounschell. The TT2 and TT3 affidavit laid out several, recent facts that established probable cause that TT2 and TT3 were being actively used to violate federal drug trafficking laws.

In sum, the affidavits for TT1, TT2, and TT3 demonstrated that the individuals using those phones were under investigation for drug trafficking – not "mere isolated violation[s]" of the law but criminal activities of "a protracted and continuous nature." *United States v. Farmer*, 370 F.3d 435, 439 (4th Cir.), *cert. denied*, 543 U.S. 1022 (2004) (citation omitted). Accordingly, the defense motion(s) to suppress the July 26, 2019 wiretap for TT2 and TT3 should be denied.

### *All Three TIII Affidavits Demonstrated Necessity*

Defendants challenge the necessity of wiretaps in the three wiretap affidavits – some defendants claim the government had enough evidence to prosecute the drug trafficking organization (DTO) without needing to resort to wiretaps, while other defendants claim the government failed to do enough investigation before resorting to wiretaps.

For example, Defendant Stewart declares that no wiretaps were necessary because, in his prosecutorial opinion, the government's "extensive" investigation had already produced "ample information to prosecute the DTO[.]" R. 189, Motion at 2, 8. On the other hand, however, Defendant Prater accuses law enforcement of not doing enough investigation, such as physical

18

surveillance, before seeking wiretap authorization. R. 213, Memorandum at 4; *see also* R. 188,

Motion at 7 (Defendant Alim Turner faults law enforcement for failing to use alternative

investigative techniques that "have been used to collect evidence for decades."). Contrary to

defendants' allegations, all the Title III affidavits in this case demonstrated necessity. The Court

should deny these motions.

The government is not required to prove that every other conceivable method has been

tried and failed, or that all avenues of investigation have been exhausted. *Alfano*, 838 F.2d at

161. Under the Sixth Circuit's necessity standard established in *United States v. Lambert*,

771 F.2d 83, 93 (6th Cir.), *cert. denied*, 474 U.S. 1034 (1985), all that is required is that the

investigators "give serious consideration to non-wiretap techniques prior to applying for wiretap

authority and that the court be informed of the reasons for investigators' belief that such

non-wiretap techniques have been or will likely be inadequate." *Lambert*, 771 F.2d at 91. *See*

*United States v. Cooper*, 868 F.2d 1505 (6th Cir.) (although ongoing traditional methods were

producing results relative to the target of an investigation of illegal prescription sales, the wiretap

was essential to bring prosecutable cases concerning street dealers and pharmacists),

*cert. denied*, 490 U.S. 1094 (1989).

As shown below, the wiretaps were far from the first or only step in the investigation. The

affidavits supporting all three wiretap authorizations laid out the investigation law enforcement

had already attempted. Despite that pre-wiretap investigation, the goals of the investigation had

not been achieved. Additionally, the affidavits also seriously considered other techniques. All three

affidavits amply demonstrated that this was a violent drug trafficking criminal enterprise that was

routinely relying on their cellular phones to conduct their drug trafficking business. *See Stewart*

305 F.3d at 305.

Finally, in evaluating the necessity component of all three wiretap affidavits, the Court should keep in mind the nature of the defendants who were being investigated: nearly all of them were members of the Vice Lords, a violent, drug-dealing street gang. *See, generally, United States v. Gardner*, 887 F.3d 780, 784 (6th Cir. 2018) (describing the Vice Lords as "a violent [] gang"); *United States v. Young*, 847 F.3d 328, 344-47 (6th Cir. 2016) (finding wiretap affidavit in a Vice Lords DTO met necessity requirement); *United States v. Cunningham*, 614 F. App'x 851, 852 (7th Cir. 2015) (describing the Vice Lords as "a violent gang that operated an open-air drug market[.]"). In paragraph four of all three Orders authorizing wiretaps in this case, the Court found that "It has been adequately established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ."

### TT1 Affidavit Demonstrated Necessity

The TT1 wiretap authorization met the required standards for necessity under the statute and applicable case law. Defendant Prater argues that "the failure in attempting to follow your defendant in his automobile appears to have been the only attempt prior to the requested wiretap that was made by the government." R. 213, Memorandum at 4. However, Defendant Prater then argues that "other than that attempt to conduct physical surveillance, the affidavit simply offers speculation…as to why other traditional means of obtaining information would not be successful." *Id*. But the TT1 affidavit demonstrates that the government actually conducted an extensive pre-wiretap investigation that meets the standards for wiretap necessity required by statute and Sixth Circuit precedent.

The TT1 affidavit delineated the legitimate goals of the investigation as follows:

- the dismantling of the DTO through lawful prosecution and conviction of its members, leaders, and suppliers;

- identification of all significant contributors to the DTO;

- collection of evidence sufficient to prosecute all significant contributors to the DTOs;

- identification of the sources of supply for the DTO including sources of the supply that may be outside the DTO; and

- collection of evidence sufficient to prosecute the DTO's sources of supply, including any international suppliers and co-conspirators. Ex. 1 at ¶ 29.

The TT1 affidavit then laid out the extensive investigation that preceded the wiretap application, and gave serious to consideration to other techniques in the context of the legitimate law enforcement investigation goals. For example, the TT1 affidavit described the counter-surveillance measures taken by Defendant Prater and others (*Id.* at ¶ 31), and further stated that:

- "agents attempted surveillance on multiple occasions" (*Id.* at ¶ 33);

- a pole cam was utilized on one of the houses used by members of the DTO, including Defendant Prater. However, the TT1 affidavit noted that while the pole cam was helpful, it could not accomplish the stated goals of the investigation on its own. (*Id.* at ¶ 36);

- law enforcement attempted to use a confidential source (CS) in the investigation. The CS bought cocaine from Defendant Prater on several occasions, (*Id.* at ¶ 19-23), but the CS "has not responded to phone calls or text messages since February 27, 2019, and is considered to be no longer cooperating with agents." (*Id.* at ¶ 37);

- the affidavit further detailed the use of consensual recording through the CS's phone, but noted that such a technique could not, by itself, accomplish the goals of the investigation. (*Id.* at ¶ 40);

- the affidavit noted the use of a subpoena for TT1, but noted that the phone was registered to a false name, which is hardly the type of evidence, by itself that dismantles DTOs. (*Id.* at ¶ 43);

- the affidavit also noted that toll history and pen registers/trap and trace information had been obtained, but since that information was limited only to a list of phone numbers in contact with TT1, that information, by itself, was of limited value and, importantly, would not accomplish the goals of the investigation. (*Id.* at ¶ 47);

- the affidavit also addressed, and seriously considered, other possible techniques (e.g., subject interviews, trash pulls, mail covers, etc.), but noted that those techniques would not accomplish the goals of the investigation and, in some cases, could jeopardize the investigation itself. (*Id.* at ¶¶ 41-42, 44-46).

21

As noted above, the government is not required to try out every possible non-wiretap investigative technique before law enforcement may seek a wiretap authorization. Instead, law enforcement is only required to "give serious consideration to the non-wiretap techniques prior to applying for wiretap authority," and to inform the issuing court, as the TT1 affidavit did, of "the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Alfano*, 838 F.2d at 163–64. Additionally, "[N]ecessity must be shown only for the investigation as a whole, not for each interceptee or target. *Wright*, 635 F. App'x at 172.

The purpose of the necessity requirement "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *Corrado*, 227 F.3d at 539 (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977). Furthermore, "the mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance." *Stewart*, 306 F.3d at 305.

Here, the TT1 affidavit demonstrated that the necessity requirement had been met. Accordingly, Judge Varlan's decision should be accorded great deference, and the defendants' motions should be denied.

### TT2 Affidavit Demonstrated Necessity

In the TT2 affidavit (Ex. 2), law enforcement stated that the goals of the investigation were the same as in the application for TT1:

- the dismantling of the DTO through lawful prosecution and conviction of its members, leaders, and suppliers;

- identification of all significant contributors to the DTO;

- collection of evidence sufficient to prosecute all significant contributors to the DTOs;

22

- identification of the sources of supply for the DTO including sources of the supply that may be outside the DTO; and

- collection of evidence sufficient to prosecute the DTO's sources of supply, including any international suppliers and co-conspirators. Ex. 2 at ¶ 37.

The TT2 affidavit laid out in detail the other techniques already attempted and considered in pursuit of these lawful investigative goals before the wiretap was sought. The prior investigation was extensive, and each alternative technique was seriously considered and discussed. For example, the wiretap application:

- detailed physical surveillance that was attempted on "multiple occasions" but did not even come close to accomplishing the goals of the investigation;

- considered the use of vehicle trackers too dangerous and unlikely to accomplish the goals of the investigation, noting case specific facts including that Defendant Alim Turner used multiple vehicles, did not have a vehicle registered in his name, and that installing a tracker was risky to the investigation with little expected investigative benefit;

- explained prior use of a pole camera in the investigation, and how it had not yielded the evidence needed to accomplish the goals in the investigation;

- described the use of a confidential source that was helpful but was unable to accomplish the goals of the investigation;

- described the case specific facts outlining past efforts to make consensual recordings through the confidential source, and noted that the confidential source was no longer friends with Defendant Alim Turner;

- considered using trash pulls, but noted that Defendant Alim Turner frequently stayed in an apartment complex where the trash was dumped into a community dumpster and thus it would be difficult to discern which apartment or person the trash was coming from;

- described the extensive use of pen registers and toll records in the case but noted their limited utility in accomplishing the goals of the investigation;

- noted that a financial investigation had begun, but had yielded limited information. The affidavit explained that street level gangs and drug trafficking organizations infrequently used the formal banking system, which made financial investigation difficult, and noted that investigators had not been able to identify any financial institutions that might be queried to advance the investigation.

23

*Id.* at ¶ 42-57.

As the TT2 affidavit demonstrates, law enforcement seeking wiretap authorization was hardly the first step in this investigation. Additionally, despite the use of other, non-wiretap investigative techniques, the goals of the investigation had not yet been met. Accordingly, Chief Judge Reeves correctly determined that the Title III necessity requirement was met, and her decision should be accorded "great deference." *Corrado*, 227 F.3d at 539.

### TT2 & TT3 Affidavit Demonstrated Necessity

In the affidavit signed on July 26, 2019, law enforcement stated that the goals of the investigation were the same as the June 5, 2019 affidavit. The affidavit described the other techniques already attempted and considered before the wiretap was sought. The prior investigation was extensive and each alternative technique seriously considered and discussed. For example, the affidavit:

- noted that the prior interception of TT2 successfully revealed that Defendant Alim Turner likely was the intended recipient of an intercepted shipment of methamphetamine; but also noted that his sources of supply, co-conspirators, and the methods used by his DTO were not fully known or identified, and that further interception was needed to make additional seizures and acquire more evidence of the involvement of other unknown co-conspirators;

- detailed additional efforts to conduct physical surveillance on April 3, 2019 and June 29, 2019. Both efforts gleaned only limited information, and the affidavit explained that on June 29, 2019, surveillance was difficult when the surveilled vehicle drove at various speeds, switched drivers, and drove up to 90 mph on the interstate. The affidavit also noted that surveilling Defendants Alim Turner and Stewart was difficult because they frequently drove different vehicles;

- outlined search warrants used to obtain geo-location data from TT1 and TT2. But the affidavit highlighted that this type of limited data had not accomplished the goals of the investigation on their own. Moreover, the affidavit pointed out that simply knowing the approximate geographical locations of the handsets for TT1 and TT2 did not reveal much about the DTO or their operations, and also noted that when turned off, the TT1 and TT2 yielded no geo-location data whatsoever;

- noted that a picture of the pole camera used in this case was posted on social media by a sister of one of the suspects in the case, which demonstrated the appreciable risks of using pole cameras, including the discovery of the pole camera used in this case;

24

- discussed the fact that the only confidential source law enforcement had been able to develop was currently unable to buy narcotics from any members of the DTO;

- noted that law enforcement was working with the postal service to attempt to identify shipments sent to locations linked to the target subjects of the investigation, including a recent seizure that was believed to be linked to this DTO;

- demonstrated the use of subpoenas to learn limited information about the users of TT2 and TT3;

- discussed possible search warrant locations, but noted that probable cause did not exist to search those locations at the present time, and noted that a search warrant was conducted on a postal package of methamphetamine.

Ex. 3 at ¶¶ 42-61.

Thus, as with the other Title III wiretap affidavits in this case, this particular affidavit demonstrated to Chief Judge Reeves the requisite necessity for wiretap authorization. The investigation preceding the application for the wiretaps was extensive; the goals of the investigation had not been met; alternative conventional techniques were attempted or seriously considered; and the issuing judge was informed of these efforts and considerations by the affidavit. The purpose of the necessity requirement "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *Corrado*, 227 F.3d at 539 (quoting *United States v. Landmesser,* 553 F.2d 17, 20 (6th Cir.1977). Furthermore, "the mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance." *Stewart,* 306 F.3d at 305. Additionally, the Sixth Circuit has pointed out that "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." *Id.*

Here, the affidavit demonstrated that TT2 and TT3 were being actively utilized to facilitate drug trafficking, thus making a wiretap "particularly appropriate." *Id.* Accordingly, defendants' motions should be denied.

### All Three Wiretaps Complied with the Title III Sealing Requirement

The law regarding Title III sealing is discussed above. In this case, "immediately" sealing the wiretaps was not possible. Knoxville wiretaps, although monitored in the Eastern District of Tennessee (EDTN), have their data recorded on servers outside of EDTN. The data on those servers, oftentimes in very large quantities, must first be downloaded onto discs, then shipped via a commercial carrier to Knoxville for sealing, and then the discs must be sealed by the district court. Therefore, these logistical realities (*i.e.*, "bona fide administrative obstacles," *Maldonado-Rivera*, 922 F.2d at 950) prevented the government from "immediately" sealing in EDTN – "within one to two days" of terminating the wiretap, *Wilkinson*, 53 F.3d at 759 – however, the government may demonstrate a "satisfactory explanation" for why there was a delay in sealing, including providing information about the bona fide administrative obstacles.

Defendant Stewart alleges that two of the sealing orders were not "immediate" and seeks suppression of the wiretaps for the short delays beyond the "immediate" requirement. R. 188 and 190. But the government advances satisfactory reasons – bona fide administrative obstacles – for the delay. Importantly, there have been no allegations of "deliberate flouting of the Title III requirements, no reason to doubt the [discs'] integrity, and no basis for inferring any other prejudice to the defendants." *Maldonado-Rivera*, 922 F.2d at 950. As discussed in more detail below, the Court should deny the defense motions to suppress the wiretaps based on a failure to seal "immediately."

Additionally, the government's conduct in sealing the discs in this case, and its explanation for any delay, is easily distinguishable from government conduct not countenanced by other courts.

26

*See, e.g., United States v. Ojeda Rios*, 495 U.S. 257, 257 (1990) (wiretap suppressed when the government failed to seal for 82 and 118 days after expiration of wiretap order, and government failed to offer a satisfactory explanation for the delay); *United States v. Liu*, 203 F. App'x 17, 19 (9th Cir. 2006) (wiretap suppressed when the government failed to seal for 60 days after the expiration of an order, and the only excuse offered was that the government believed the tapes "could be sealed at the end of the investigation."); *United States v. Carson*, 969 F.2d 1480, 1497 (3d Cir. 1992) (wiretap suppressed when the government delayed sealing by 34-days, when the proffered reason for the delay was "audio enhancement" of the wiretap).

### Sealing of TT1 Complied with Title III

The government provided a satisfactory explanation as to why the March 26, 2019 wiretap was not sealed "immediately." Namely, the wiretap data had to be downloaded onto discs and then shipped to Knoxville for sealing.

The March 26, 2019 wiretap went down on April 24, 2019. Ex. 4. As noted in the sealing application, *Id.* at fn 1, the discs were requested the next day, received in Knoxville on April 29, 2019, and made available to the Court that same day. The discs were sealed the next day. This explanation for the minimal, unavoidable and brief delay in sealing the disc is a "satisfactory" reason.

### Sealing of TT2 Complied with Title III

The government provided a satisfactory explanation as to why the March 26, 2019 wiretap was not sealed "immediately." Namely, the wiretap data had to be downloaded onto discs, and then shipped to Knoxville for sealing.

The application to seal the June 5, 2019, Ex. 5, wiretap noted a satisfactory reason for the delay: "The wire was taken down at approximately midnight on July 5, 2019. On that same date, the case agents requested that the wire contents be downloaded onto discs and forwarded to

27

Knoxville, TN for sealing. The discs were received on July 10, 2019, and on that same date this office requested an appointment to seal with the Court." *Id.* at fn. 1. The wiretap went down on July 5, 2019, and discs were requested for sealing immediately. Once those discs were received in Knoxville, the Court was immediately contacted and a date for sealing was set the very next day.

### Sealing of TT3 and (second) TT2 Complied with Title III

The July 26, 2019 wiretap was sealed on August 9, 2019, well before the Court-authorized period of interception expired on or about August 25, 2019. As such, and under the plain language of the statute, the wiretap was sealed before "the expiration of the interception period." 18 U.S.C. § 2518(8)(a); *see also United States v. Batiste*, No. 06-20373-CR, 2007 WL 2412837, at 14 (S.D. Fla. Aug. 21, 2007) ("The length of the sealing delay is thus measured from the date the wiretap order (or extension order) expires, not the date the surveillance ends"). Because the wiretap was sealed within the authorized period of interception, there can be no "delay" and, therefore, the wiretap was sealed in compliance with Title III.

In any event, this wiretap was sealed immediately, "within one or two days," after the wiretap was terminated by law enforcement. On August 3 and 6, 2019, law enforcement terminated interceptions on TT3 and TT2, respectively. On August 8, the government contacted chambers and made the recordings "available to the judge" to be sealed under her directions. *See* 18 U.S.C. § 2518(8)(a). ("Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions."). Chief Judge Reeves' chambers directed that the discs be sealed the following day. Accordingly, the wiretap discs were made available for sealing within two days of the wiretap's termination, in compliance with Title III.

Assuming *arguendo* that this Court were to find that this particular wiretap was not sealed before the expiration of the period of interception, or "immediately" thereafter, the government

advances a satisfactory explanation for the brief delay. In the application to seal the July 26, 2019 wiretap, Ex. 6, the government noted: "The wire was taken down at approximately 6:45 p.m. August 2, 2019. On August 6, 2019, the case agents requested that the wire contents be downloaded onto discs and forwarded to Knoxville, TN for sealing. The discs were received on August 8, 2019, and on that same date this office requested an appointment to seal with the Court." *Id.* at fn. 1. This timeline, however, misstated what occurred on August 2, 2019.

On August 2, 2019, law enforcement stopped two defendants – Defendants Gilmore and Forbes – and seized more than $13,000 in drug proceeds as the pair attempted to travel to Nashville to pay the Mexican source of methamphetamine supply. Additionally, during the course of that enforcement action, law enforcement seized TT3, which was in Defendant Gilmore's possession. In response to this development on August 2, law enforcement stopped fully staffing the monitoring of the lines, in part because the handset for TT3 was now in the possession of law enforcement. Law enforcement, however, continued to monitor the lines, but on a reduced staffing level, until August 3 (TT3) and 6 (TT2), 2019. No further communications on TT2 and TT3 were intercepted after August 2, 2019.

On August 6, 2019, law enforcement, in consultation with the United States Attorney's office, terminated the interception of TT2 and requested that TT2 and TT3 be immediately downloaded onto discs for sealing. The discs were then shipped overnight from Atlanta, Georgia, and received in Knoxville on August 8, 2019. The United States Attorney's office then contacted the Court that same day and was instructed to seal the discs the following day on August 9, 2019. Additionally, the AUSA assigned to the case at that time, Kevin Quencer, was overseas in Italy on military orders during this period of time, having departed Knoxville in the early hours of the morning on August 3, 2019, and arriving in Italy on August 4, 2019. AUSA Quencer, working by military orders as Lieutenant Commander Quencer, was in Italy for approximately three weeks

29

and working for the United States Navy during that time. He was thus not involved in the wiretap termination and sealing process. Likely because of this departure of the assigned AUSA and subsequent misinterpreted communications between law enforcement and the United States Attorney's Office, the government's application for sealing mistakenly and incorrectly noted that the interception had "terminated" on August 2, 2019, when in fact they had not terminated until August 3 (TT3) and 6 (TT2), 2019. The timeline is noted below:

- Friday, August 2, 2019: TT3 seized by law enforcement and full staffing for monitoring of wiretap for TT2 and TT3 discontinues, but monitoring continues on a reduced level;

- Saturday, August 3, 2019: TT3 interception terminated;

- Tuesday, August 6, 2019: TT2 interception terminated and production of TT2 and TT3 discs immediately requested by law enforcement;

- Thursday, August 8, 2019: Discs are received in Knoxville and the Court is contacted for sealing; sealing is directed by the Court to occur the next day;

- Friday, August 9, 2019: TT2 and TT3 wiretaps are sealed.

In any event, the facts here constitute the kind of bona fide and satisfactory explanation courts have routinely accepted when wiretaps are not sealed "immediately." The government moved expeditiously to comply with the statute, the delay was brief, and there are no allegations of tampering or prejudice to the defendants. *See Maldonado-Rivera*, 922 F.2d at 950; *Wilkinson*, 53 F.3d at 760, (citing *Madonado-Rivera*).

Indeed, courts have refused to suppress wiretaps in cases that involve longer sealing delays, coupled with a more generalized excuses for the delay by the government. *See United States v. Scafidi*, 564 F.2d 633, 641 (2d Cir.), *cert. denied*, 436 U.S. 903 (1978) (suppression not warranted due to 7-day sealing delay and government's proffered reason for delay was the prosecutor's preoccupation with the upcoming trial, with such explanation being "fully in accord with the requirements of [Title III]"); *United States v. Stegemann*, 40 F. Supp. 3d 249, 273 (N.D.N.Y.

30

2014), *aff'd in part*, 701 F. App'x 35 (2d Cir. 2017) (three-month sealing delay excused when government's reason for delay was confusion about whether it had to follow a different state sealing statute and "there is no evidence that [the defendant] was prejudiced through compromise of the recordings or that the government employed bad faith to gain a tactical advantage.").

The Court need not reach the question of an explanation from the government here. The wiretaps were sealed within the Court-authorized expiration period, and thus statutorily sealed "before the expiration of the interception period." For all the reasons stated above, the United States respectfully submits that the wiretaps were sealed within the confines of the law and the defense motions to suppress should be denied. In this case, the delays were minimal and unavoidable sealing delays were satisfactorily explained by the bona fide administrative obstacles the government faced in this case. Accordingly, the Court should deny the defense motions to suppress the wiretap. Nor is an evidentiary hearing required to resolve this motion to suppress. *See United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009) ("In reviewing the sufficiency of the evidence supporting probable cause, we are limited to examining the information contained within the four corners of the affidavit").

2. <u>**RESPONSE TO DEFENDANT STEWART'S MOTION TO SUPPRESS EVIDENCE FROM 301 LIPPENCOTT AND MOTION FOR A *FRANKS* HEARING (R. 191)**</u>

<u>*Facts*</u>

During a multi-month Title III wiretap investigation, law enforcement gathered evidence of this particular set of Vice Lords, of which Defendant Stewart is a member, which showed repeated and extensive drug trafficking from June – August 2019. Much of this evidence consisted of Defendant Stewart's incriminating admissions about large volume drug trafficking with his co-defendants over the wiretap.

On August 2, 2019, Defendant Stewart and Defendant Gilmore had several discussions, which agents listened to real-time, about actively collecting drug debts from drug customers – totaling more than $13,000. The wiretap showed that this drug money was being collected so that Defendants Gilmore and Forbes could take the cash to Nashville and pay the Mexican source of methamphetamine supply and get more methamphetamine to distribute. During a series of recorded calls on August 2, Defendant Stewart instructed Defendant Gilmore to meet him at the TA Truck Stop off Watt Road so that Defendant Stewart could provide Defendant Gilmore with Defendant Stewart's part of the methamphetamine money. In response to this real-time information, agents set up surveillance at the TA Truck Stop and observed the defendants meet with each other. Shortly after the meeting, law enforcement promptly stopped Defendant Gilmore's car, which Defendant Forbes was driving and Defendant Gilmore was the passenger, and seized $13,130 in cash which was buried and concealed within a bag of dog food that had been re-sealed.

Based on Defendant Stewart's extensive, repeated, and self-admitted drug trafficking activity on the wiretap, as well as the significant methamphetamine money seizure from Defendants Gilmore and Forbes, law enforcement took steps to confirm that Defendant Stewart resided at apartment 512 on 301 Lippencott Street. On September 4, 2019, FBI-TFO Brandon Stryker ("agent Stryker") applied for and received a federal search warrant for Defendant Stewart's apartment at 301 Lippencott Street. (R. 191-1, Search Warrant and Affidavit). Agents executed the federal search warrant at Defendant Stewart's residence the next day, on September 5, and found appreciable evidence of drug trafficking, including: a loaded assault rifle with a collapsible stock; assault rifle ammunition; multiple cell phones; multiple drug scales; more than $550 cash; illegal prescription pills; marijuana; and hand-written Vice Lords gang literature. (R. 191-2 & 3, Evidence Log).

## Non-Material Inaccuracies in the Affidavit do not Warrant a Franks Hearing

Defendant Stewart's claim that agent Stryker's affidavit included knowingly or recklessly false statements is without merit and should be denied.

As an initial matter, affidavits offered in support of and incorporated into the warrant carry a presumption of validity. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). In *Franks*, the Supreme Court established a stringent standard that a defendant must satisfy in order to refute that presumption at an evidentiary hearing. *Id.* Importantly, *Franks* highlighted the stringency of a defendant's burden in making this "substantial preliminary showing" before he is even allowed to delve behind the warrant:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof . . . allegations of negligence or innocent mistake are insufficient . . . Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Id.* at 171-72. The Supreme Court also elaborated on how the substantive accuracy of representations made in an affidavit should be viewed within the context of the Fourth Amendment: "This does not mean 'truthful' in the sense that every fact recited in the affidavit is necessarily correct, for probable cause may be founded on hearsay and upon information received from informants, as well as information within the affiant's own knowledge that sometimes must be garnered hastily." *Id.* at 165; *see also Illinois v. Gates*, 462 U.S. 213, 235 (1983) (recognizing that search warrants "are normally drafted by nonlawyers in the midst and haste of a criminal investigation."). The Court should apply a subjective test when determining whether the false statement was recklessly or intentionally made. *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019).

33

The Seventh Circuit noted, "these elements are hard to prove, and thus *Franks* hearings are rarely held." *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000). A defendant seeking a *Franks* hearing "bears a substantial burden to demonstrate probable falsity." *United States v. Hornick*, 815 F.2d 1156, 1158 (7th Cir. 1987). Moreover, "an unimportant allegation, even if viewed as intentionally misleading, does not trigger the need for *Franks* hearing." *Swanson*, 210 F.3d at 791. Importantly, as stated above, a defendant requesting a *Franks* hearing must first provide an "offer of proof . . . accompanied by a statement of supporting reasons" that substantiates his allegations that the affiant swore to an affidavit that the affiant knew contained knowingly or recklessly false information that was material to the probable cause finding. *Franks*, 438 U.S. at 171-72. Regarding what an offer of proof must detail, the Sixth Circuit held, "A defendant must make two showings as part of this offer of proof, (1) that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit and (2) that the false statement or material omission is necessary to the probable cause finding in the affidavit." *United States v. Pirosko*, 787 F.3d 358, 369 (6th Cir. 2015).

Defendant Stewart identifies several immaterial inaccuracies in the following paragraphs of agent Stryker's affidavit:

- Para. 9, which generally describes the federal wiretap authorizations, *incorrectly* lists TT2's phone number as "423-295-5574", when it should have been "865-455-0315" (R. 191, Motion to Suppress at 5)[5];

- Para. 13, which discusses Defendants Alim Turner's and Stewart's incriminating conversation about multi-pound shipments of methamphetamine, *incorrectly* states that the conversation occurred "[i]n July of 2019", when it should have stated that the incriminating conversation occurred on June 30, 2019 (*Id*. at 3-5);

---

[5] In his motion, Defendant Stewart inaccurately recited the TT2 phone number from the affidavit as "423-395-5574." (R. 191, Motion to Suppress at 5).

34

- Para. 15, which discusses Defendants Stewart and Gilmore coordinating the acquisition of more than $13,000 in methamphetamine money and delivery of the same to the Mexican source of supply in Nashville, *incorrectly* states that "[s]urveillance units observed USHERY deliver a bag of dog food to Gilmore at the TA[]", when it was actually Defendant Gilmore who had the dog food bag in which their methamphetamine money was hidden (*Id.* at 6);

- Though not raised by Defendant Stewart in his motion, the United States notes for the Court that the affidavit *incorrectly* lists in paragraph 8 the date of indictment as "August 4, 2019", when it should have been listed as "September 4, 2019".

The United States concedes that the "423" number listed for TT2 in paragraph 9 is inaccurate; however, the phone number assigned to TT2 did not need to be included in the affidavit because it was immaterial to a finding of probable cause. It was sufficient for the affidavit to alert the reviewing federal magistrate, as paragraphs 7, 9, and 10 do, that the drug trafficking investigation involving Defendant Stewart and others included "lawful intercepts of wire and electronic communications." (R. 191-1, Stryker Affidavit at 9-10). Accordingly, the inaccurate numerical phone number for TT2 in paragraph 9, as well as the typographical error as to the date of indictment in paragraph 8, are merely "unimportant allegation[s]" that were immaterial to the finding of probable cause. *Swanson*, 210 F.3d at 791.

The United States also concedes that, while Defendant Stewart's conversation with Defendant Alim Turner about receiving "pounds of meth shipped" to Knoxville did, in fact, occur, it did not occur in "July", as stated in paragraph 13 of the affidavit. In attempting to make his argument, Defendant Stewart attached as an exhibit to his motion approximately 661 pages of wiretap linesheets from July 2019. (R. 191-4 & 5, Linesheets). In so doing, Defendant Stewart attempts to make a mountain out of a molehill because, as part of his discovery in this matter, he received a two-minute phone call and transcript that occurred on June 30, 2019 at 7:30 pm,

35

between Alim Turner (AT) utilizing TT2 and Ushery Stewart (US) utilizing (423) 295-5574[6], the transcript of which reads:

> US:   Hello?
>
> AT:   What's poppin'?
>
> US:   I'm just makin' sure you straight, P.
>
> AT:   Yeah, I'm at, uh, Nashville. Hey –
>
> US:   Yeah.
>
> AT:   Hey, has Woogie said that, if I get these Ps of ice,[7] uh, to an address then he gonna go cop 'em?
>
> US:   Dude, that's a given, bro.
>
> AT:   Huh?
>
> US:   That's a given.
>
> AT:   What you mean 'that's a given'?
>
> US:   Like, that's, of course, bro.
>
> AT:   Aight, uh, I'm have to have them gone in a week.
>
> US:   How many of them?
>
> AT:   Five n*gga, the first time. Then the second time, ten.
>
> US:   Yeah.
>
> AT:   Aight, aight so you sure we can do that though?
>
> US:   Yeah, as soon as he got a good spot to send 'em.

_____

[6] This "423" number, while admittedly not belonging to TT2, was, in fact, a number utilized by Defendant Stewart to further his drug trafficking crimes. *Compare* R. 191, Motion to Suppress at 5 ("The 423 number is alleged to have been associated with a phone used by Mr. Stewart.").

[7] "Woogie" is co-defendant Christopher Hounschell (*see*, R. 78, Superseding Indictment listing aliases) and "Ps of ice" means pounds of methamphetamine.

AT:   I got a, uh, I can get a spot. Aye, though –

US:   Yeah.

AT:   What's up with my Roane County? I'm fittin' to have all these Rs cause All-Star[8] really got locked up, he ain't answerin' the phone still.

US:   Hell, yeah (U/I).

AT:   Yeah, and he had that H[9] on him.

US:   Oh, yeah, right.

AT:   I think he did, fool. I know he had all my (U/I) on him.

US:   Damn, they was probably at whatever hotel he was at. He ain't that dumb. He don't just be ridin' around like that.

AT:   Yeah, oh shit. Lil' John tryin' shit, bruh.

US:   Aight.

AT:   It's mighty.

US:   Mighty.

Ex. 7, Transcript of June 30, 2019 call between Alim Turner & Ushery Stewart.

Accordingly, the information provided by agent Stryker in paragraph 13 of the affidavit refers to this June 30, 2019 wiretapped phone call. Admittedly, this call, wherein Defendant Stewart and Defendant Alim Turner discuss obtaining "pounds of methamphetamine," occurred approximately 4.5 hours *before* June 2019 officially became "July 2019". However, Defendant Stewart's hyper-technical reading of the date in the first sentence of paragraph 13 "[a]t most, present[s] [a] minor inconsistenc[y]," which is insufficient to meet the heavy requirements necessary to receive a *Franks* hearing. *United States v. Benanti*, No. 3:15-cr-177, 2017 U.S. Dist.

---

[8] "Rs" means Roxicodone and "All-Star" is co-defendant Camaron Billips (*see*, R. 78, Superseding Indictment listing aliases).

[9] "H" means heroin.

37

LEXIS 108375, *7 (E.D. Tenn. Jul. 13, 2017) (Varlan, J.); *see also United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996) ("[W]e remain cautious not to interpret the language of affidavits in a 'hypertechnical' manner.") (internal citations omitted).

Lastly, the United States concedes that, though paragraph 15 demonstrates Defendants Stewart and Gilmore conspiring to both gather methamphetamine money in order to obtain more methamphetamine in Nashville, it was Defendant Gilmore – not Defendant Stewart – who procured the dog food bag in which to secrete the methamphetamine money so that it could be used to pay the Mexican source of supply – whom they refer to as "the plug" (R. 191-1, Stryker Affidavit at 11) – in Nashville. Nevertheless, it was immaterial to a finding of probable cause whether it was Defendant Gilmore or Defendant Stewart, or someone else, who introduced the bag of dog food to the methamphetamine money scheme. What was important for the probable cause finding was not the bag of dog food, but the incriminating conversations between the two drug dealers and the $13,130 in methamphetamine money that they gathered and hid inside of the dog food bag and which was seized by Tennessee Highway Patrol on August 2, 2019. This material fact, which Defendant Stewart does not claim to be knowingly or recklessly false, was included in paragraph 15 of the affidavit. *Id*. at 12.

In short, none of the affidavit's inaccuracies were material to a finding of probable cause. Accordingly, Defendant Stewart cannot meet his heavy burden in order to obtain a *Franks* hearing. Moreover, Defendant Stewart's defective "Affidavit of Counsel" does not breathe life into his otherwise lifeless *Franks* demand. In an attempt to make the required "offer of proof," as required by *Franks*, opposing counsel provides an affidavit that says, essentially, that Defendant Stewart will testify he did not transfer a bag of dog food from his car into another car. R. 191-7, Affidavit of John Barnes. However, in light of the United States' concession regarding the affidavit's inaccurate information about who brought the bag of dog food to the TA and, more

38

importantly, the immateriality of who introduced the bag of dog food to the scheme, there is no need for Defendant Stewart to testify.

More fundamentally, the "Affidavit of Counsel" (R. 191-7, Affidavit of John Barnes) is devoid of any information about agent Stryker's culpability regarding the affidavit's statement about the dog food. The Barnes affidavit says nothing, and offers no proof, that agent Stryker acted knowingly or recklessly. Simply accusing an affiant of a knowing or reckless falsity about a particular (and, in this case, immaterial) fact in the affidavit, and then attaching to the motion to suppress a statement that purports to contradict that fact is not tantamount to making the required substantial preliminary showing of both knowing or reckless falsity *and* materiality as required by *Franks*. If that were all it took to make the required substantial preliminary showing, there would be a *Franks* hearing anytime a defendant identified *any* inaccuracies in the affidavit. *Butler v. City of Detroit*, 936 F.3d 410, 418-20 (6th Cir. 2019) (observing, in a § 1983 case, "[w]e have never said that a plaintiff shows 'deliberate falsehood' by simply contradicting the warrant affidavit…[T]here must be evidence of more than mere factual inaccuracy to overcome *Franks* in both criminal and § 1983 cases."). Indeed, the Supreme Court recognized this and accounted for it by setting the bar much higher for defendants wishing to delve behind the four-corners of the affidavit. "A defendant must make two showings as part of this offer of proof, (1) that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit and (2) that the false statement or material omission is necessary to the probable cause finding in the affidavit." *United States v. Pirosko*, 787 F.3d 358, 369 (6th Cir. 2015) (citing *Franks* 438 U.S. at 171-72)). The Barnes affidavit fails to make either showing.

Accordingly, the Court should deny Defendant Stewart's request for a *Franks* hearing because he has failed to first make the requisite substantial preliminary showing that the affidavit

39

contained a knowingly or recklessly false statement or that such a false statement, even if knowingly or recklessly made (it was not), was material to a finding of probable cause.

### *The Affidavit Established a Nexus*

The Stryker affidavit established a sufficient nexus to demonstrate the likelihood that evidence of drug trafficking would be found at Defendant Stewart's residence.

To start, agent Stryker laid out his training and experience in the affidavit which included, among other things, 13 years in law enforcement, including 8 years as a narcotics investigator; extensive local, state, and federal drug enforcement training courses; and that he has been qualified as an "expert in narcotics investigations and testified as such in the Sixth Judicial Circuit Criminal Court in Knoxville, TN." R. 191-1, Stryker Affidavit at 2-3. He also stated that, based on his training and experience, he knows that drug dealers keep not only drugs at their residences, but also "paraphernalia for packaging, cutting, weighing, transporting, and distributing controlled substances…[and relevant, drug-related] documents and records." *Id*. at 4, 7-8.

The affidavit also established, via various means, that Defendant Stewart lived at 301 Lippencott Street, Apartment 512, from at least June 25 through September 4, 2019; the affidavit established this fact by reviewing Defendant Stewart's driver's license which stated he lived at the target residence, interviewing a mail carrier on September 4, 2019, who had parcels of mail, including mail from Knox County Criminal Court Clerk, addressed to Defendant Stewart at the target residence, and confirming that the Infinity parked outside the target residence was registered to Defendant Stewart. *Id*. at 13.

Finally, Attachment B to the affidavit, which identified the particular things to be seized, was not limited solely to drugs, but also included items such as:    packaging materials, drug

40

ledgers, scales, cash, financial instruments, financial records of drug transactions, firearms and ammunition, and cellular phones. *Id*. at 16-17.

The affidavit, which included specific wiretap calls outlined in paragraphs 11-15, described Defendant Stewart's repeated and extensive drug trafficking in the summer of 2019 with his co-conspirators, oftentimes involving substantial quantities of methamphetamine. *See*, *e.g.*, *Id*. at 10, "two ounces" of methamphetamine; *Id*. at 11, "pounds of methamphetamine"; *Id*. at 11-12, "$13,130 headed to Nashville as payment for" methamphetamine.

In cases such as this, federal appellate courts, including the Sixth Circuit, have repeatedly held that "in the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998). Contrary to Defendant Stewart's argument, this principle holds true even when the affidavit contains no direct evidence of drug trafficking at the drug dealer's residence. *See United States v. Gunter*, 551 F.3d 472, 476-77, 481 (6th Cir. 2009) (affirming denial of suppression motion despite affidavit's lack of "any facts indicating that Gunter was dealing drugs from his residence," because numerous recorded phone calls revealed that "the quantity of drugs and the repeated nature of the transactions make it reasonable to conclude that Gunter was engaged in ongoing drug trafficking, it was reasonable to infer that evidence of illegal activity would be found at Gunter's residence"); *United States v. Goward*, 188 F. App'x 355, 358-60 (6th Cir. 2006) ("[even] when there is absolutely no indication of any wrongdoing occurring at [the drug dealer's] residence…drug trafficking, which the affiant witnessed and is further substantiated from his experience and training, establishes a sufficient nexus to support a finding of probable cause to search the place where the drug trafficker presently lives"); *United States v. Kenny*, 505 F.3d 458, 461-62 (6th Cir. 2007) (nexus established even though affidavit contained no facts showing residence had been used in drug trafficking, because defendant, found at an operating methamphetamine lab, was identified as the

41

"cook" for a large drug operation by a reliable and corroborated informant); *United States v. Miggins*, 302 F.3d 384, 388 (6th Cir. 2002) (sufficient nexus established even though affidavit contained no facts showing that the residence had been used in drug trafficking when kilogram of cocaine mailed from Los Angeles was intercepted; in police controlled delivery, defendants used an alias to sign for the package, defendants immediately departed and upon arrest possessed paper with the aliases and address of the delivery; L.A. police identified defendants as drug traffickers; defendants admitted membership in an L.A. gang; and defendants lived together at the residence searched); *United States v. Hodge*, 246 F.3d 301, 306 (3rd Cir. 2001) (reversing district court and finding that, though the affidavit contained "no direct evidence that drugs or drug paraphernalia would be located at Hodge's home," the magistrate could conclude that evidence would be found in Hodge's home because "Hodge was an experienced and repeat drug dealer who would need to store evidence of his illicit activities somewhere"); *United States v. Feliz*, 182 F.3d 82, 86-88 (1st Cir. 1999) (finding "sufficient showing of probable cause" for search of "long-time, successful, drug trafficker['s]" apartment, despite lack of direct evidence linking apartment to trafficking); *United States v. McClellan*, 165 F.3d 535, 546 (7th Cir. 1999) (noting "that in the case of drug dealers evidence is likely to be found where the dealers live"); *United States v. Restrepo*, 994 F.2d 173, 188 (5th Cir. 1993) (finding probable cause to search drug dealer's home even though affidavit did not describe any drug activity there, as affiant with 11 years of experience "had observed that drug traffickers maintain records relating to drug activity at a place such as a home" and "that contraband, drug proceeds and other indicia of drug trafficking such as coded telephone numbers, photographs and firearms are secreted in safe places such as homes").

The Stryker affidavit demonstrated that Defendant Stewart was actively and repeatedly involved in acquiring, attempting to acquire, and selling large quantities of drugs, including

pounds of methamphetamine. In light of that evidence, and in accordance with the cases cited above, the United States Magistrate Judge was justified in finding that probable cause existed to search Defendant Stewart's residence for evidence of drug trafficking.

Defendant Stewart attempts to avoid this conclusion by casting the probable cause in the Stryker affidavit as consisting *solely* of Defendant Stewart's supposed "status as a drug dealer." R. 191 at 7. He is wrong. To be sure, the Sixth Circuit has held that "a defendant's status as a drug dealer, *standing alone*" will not "give[ ] rise to a fair probability that drugs will be found in his home." *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005) (emphasis supplied); *see also United States v. Brown*, 828 F.3d 375, 384 (6th Cir. 2016) (reaffirming *Frazier* but also observing that "the evidence supposedly establishing Brown's status as a drug dealer was also inadequate"). Unlike the "inadequate" affidavit in *Brown*, the Stryker affidavit established Defendant Stewart as a significant drug trafficker engaged in ongoing and extensive drug trafficking crimes – and the Stryker affidavit established these facts not with uncorroborated informant tips about Defendant Stewart's supposed "status as a drug dealer," but with Defendant Stewart's own incriminating words and the words of his co-defendants on the wiretap. R. 191-1 at 9-11.[10] Defendant Stewart's claim that the Stryker affidavit was based exclusively on Defendant Stewart's status as a drug dealer, or that the affidavit failed to establish a nexus, is based neither in law or fact. Accordingly, his motion to suppress should be denied. Nor is an evidentiary hearing needed to resolve this suppression motion. *See Dyer*, 580 F.3d at 390 ("In

---

[10] Defendant Stewart's reliance on *United States v. Frazier*, 423 F.3d 526 (6th Cir. 2005) is misplaced and undermines his argument, especially when contrasting the Stryker affidavit with the affidavit at issue in *Frazier*. In *Frazier*, the Sixth Circuit described the affidavit as "based almost exclusively on the uncorroborated testimony of unproved confidential informants." *Id.* at 533. Conversely, the Stryker affidavit is based on wiretap calls that detail Defendant Stewart's drug trafficking, as well as a seized package containing approximately five pounds of methamphetamine.

43

reviewing the sufficiency of the evidence supporting probable cause, we are limited to examining the information contained within the four corners of the affidavit").

### *The Officers Reasonably Relied on the Warrant in Good Faith*

Alternatively, if this Court finds that the United States Magistrate Judge lacked a substantial basis for issuing the search warrant, suppression is not warranted because the officers reasonably relied on the warrant in good faith. It is axiomatic that, under what is commonly referred to as the "*Leon* good faith exception," courts may not suppress "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). In other words, the exclusionary rule does not prevent the "admission of evidence seized in reasonable, good-faith reliance on a search warrant." *Id*. at 905. The *Leon* good faith exception applies unless: (1) the issuing magistrate was misled by knowing or reckless false statements in the affidavit; (2) the issuing magistrate wholly abandoned his or her judicial role; (3) the affidavit was so lacking "in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant was so facially deficient (*i.e.*, failing to particularize the place to be searched or items to be seized) that the officers could not have presumed it to be valid. *United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998) (internal quotations omitted).

The Stryker affidavit was not based on false information. Nor is there an argument that the United States Magistrate Judge abandoned his role as a neutral arbiter of the sufficiency of the affidavit, or that the warrant was so lacking in "indicia of probable cause as to render official belief in its existence entirely unreasonable," or that the warrant was facially deficient.

An officer's belief that a search warrant affidavit provided a sufficient nexus between criminal activity and the place to be searched is only unreasonable if the affidavit was "so vague as to be conclusory or meaningless." *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir.

44

2004) (en banc). Put another way, the *Leon* good faith exception applies unless the "affidavit contained mere conclusory assertions or a single piece of evidence which the law of the station house would recognize as clearly insufficient." *Id.* (quoting *United States v. Williams*, 3 F.3d 69, 74 (3d Cir. 1993)).

Here, agent Stryker prepared a lengthy affidavit detailing the drug trafficking activities of Defendant Stewart and his co-defendants, including incriminating wiretap calls openly discussing extensive drug trafficking. To hold that the affidavit in this case was "so vague as to be conclusory or meaningless," *Carpenter*, 360 F.3d at 596, would be to improperly ratchet the *Leon* good faith standard up to a level essentially on par with the probable cause standard. *See also*, *United States v. Washington*, 380 F.3d 236, 241, (6th Cir. 2004) ("*Carpenter* makes it clear that the 'so lacking in indicia' test is less demanding than the 'substantial basis' test. Thus, it is entirely possible that an affidavit could be insufficient for probable cause but sufficient for 'good faith' reliance.")

Furthermore, assuming *arguendo* that the Stryker affidavit was insufficient to establish probable cause, "only a police officer with extraordinary legal training"—indeed legal training so extraordinary that it exceeds that of a highly respected and experienced United States Magistrate Judge—would have been capable of concluding that the magistrate judge erred by issuing the warrant. *United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998) (applying the *Leon* good faith exception where the affidavit failed to provide a nexus between the defendant's criminal activity and the residence searched). If the warrant was not supported by probable cause in this case, then the *Leon* good faith exception saves the evidence from suppression.

At the end of the day, this Court should not lose sight of the fact that the "officers in this case did what the Constitution requires" and application of the exclusionary rule here "would tend to discourage police officers from submitting their evidence to a judicial officer before

45

acting." *United States v. Ventresca*, 380 U.S. 102, 108, 112 (1965). After all, the exclusionary rule only applies if the officer's conduct was "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). There certainly was no deliberate police misconduct here or any other culpable actions taken by agent Stryker that suppression would deter.

### 3. RESPONSE TO DEFENDANT PRATER'S MOTION TO DISMISS SUPERSEDING INDICTMENT AND MULTIPLICIOUS COUNTS (R. 193, 194)

Since Defendant Prater participated in two separate conspiracies (*i.e.*, the crack conspiracy in case number 3:19-cr-152, and the poly-drug conspiracy in case number 3:19-cr-151, hereinafter referred to as "case 152" and "case 151"), his motion should be denied because the indictments do not violate the double jeopardy clause of the Fifth Amendment.

### *Timeline*

A clear timeline will facilitate the Court's analysis of Defendant Prater's motion:

- **9/4/19**: Grand Jury indicted case 152, (R. 1, Indictment, in which Defendant Prater was the sole defendant in a single-count crack conspiracy, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C), the charged timeframe of the crack conspiracy was December 2018 – April 2019, with the venue specified as being within the Eastern District of Tennessee and elsewhere));

- **9/4/19**: Grand Jury indicted case 151, (R. 3, Indictment, in which Defendant Prater is not a defendant, and which charged 5 individuals in a single-count 50 gram or more methamphetamine conspiracy, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), the charged timeframe of the methamphetamine conspiracy was June 2018 – August 2, 2019, with the venue specified as being within the Eastern District of Tennessee and elsewhere));

- **11/22/19**: Defendant Prater entered a guilty plea to the sole count the indictment in case 152 (R. 23, Minute Entry), pursuant to a signed plea agreement (R. 15, Plea Agreement);

- Law enforcement continued its investigation of case 151 through the remainder of 2019 and into 2020;

- **1/21/20**: the U.S. Attorney's Office contacted counsel for Defendant Prater and advised counsel that the government planned to seek a Superseding Indictment in case 151 and that Defendant Prater would be charged with multiple offenses in that Superseding Indictment;

- **2/3/20**: the U.S. Attorney's Office sent supplemental discovery to all defense counsel in case 151; due to the earlier conversation with counsel for Defendant Prater wherein the government advised that it intended to charge Defendant Prater in the Superseding Indictment for case 151, and as a professional courtesy, the U.S. Attorney's Office sent counsel for Defendant Prater the same supplemental discovery for case 151;[11]

- **3/3/20**: Grand Jury returned Superseding Indictment in case 151, in which Defendant Prater and 11 others are charged with conspiring to distribute several controlled substances (however, crack is not one of the controlled substances the case 151 defendants conspired to distribute), and various firearms and substantive drug crimes; the charged timeframe of the drug trafficking conspiracy was: July 15, 2018 – November 22, 2019, with the venue specified as being within the Eastern District of Tennessee and elsewhere)); specifically, the Superseding Indictment in case 151 charges Defendant Prater with:

  - Count One: conspiring to distribute 50 grams or more of methamphetamine, fentanyl, Roxicodone, Xanax, marijuana, buprenorphine, and heroin;

  - Count Two: aiding/abetting possession of firearms in furtherance of the drug trafficking conspiracy charged in Count One;

  - Count Six: distributing 50 grams or more of methamphetamine at the end of July 2019;

  - Count Seven: possession of a firearm in furtherance of the specific drug trafficking crime charged in Count Six

### _Law & Argument_

The question for the Court is whether the agreement in the conspiracy charged in case

152 was the same agreement for the conspiracy charged in case 151. They were not the same

---

[11] In that 2/3/20 discovery letter, which Defendant Prater attached as an exhibit to the instant motion (R. 194-1, Discovery Letter), "case number 3:19-CR-152" was referenced in the heading of the letter. Case 152 was listed in the heading of that correspondence because, as of 2/3/20, case 152 was the only case pending before the Court in which Defendant Prater was a named defendant. Prater was not charged in case 151 until 3/3/20, when the Grand Jury returned the Superseding Indictment in case 151. _See_ case 151, R. 78, Superseding Indictment. Accordingly, and in light of the earlier communication with counsel, it is incorrect for Defendant Prater to use the heading in the correspondence accompanying the advanced discovery provided to him on 2/3/20 to now claim that "the United States believed" that the separate conspiracies charged in case number 151 and 152 were really one and the same conspiracy. R. 194, Memorandum at 6. As shown below, cases 152 and 151 charge and punish two separate conspiracies.

47

agreement. The Supreme Court and the Sixth Circuit defined the gravamen of the crime of conspiracy:

> In a conspiracy case it is the agreement which forms the nucleus of the offense. In *Braverman v. United States*, 317 U.S. 49, 53 (1942) the Court said, the gist of the crime of conspiracy as defined by the statute is the agreement. Therefore, a determination of whether the government can prosecute on more than one conspiracy rests on whether there exists more than one agreement.

*United States v. Sinito*, 723 F.2d 1250, 1256 (6th Cir. 1983). Accordingly, if it is the same agreement, then the double jeopardy clause of the Fifth Amendment is violated and the conspiracy charge in case 151 must be dismissed as to Defendant Prater. The United States will demonstrate, via the Sixth Circuit's "totality of the circumstances test" as outlined in *Sinito*, 723 F.2d 1250, that the conspiracies charged in case 152 and 151 involved separate agreements and, therefore, do not violate double jeopardy. In determining whether two conspiracies arise from a single agreement:

> [the district court] must consider the elements of: 1) time; 2) persons acting as co-conspirators; 3) the statutory offenses charged in the indictments; 4) the overt acts charged by the government or any other description of the offenses charged which indicates the nature and scope of the activity which the government sought to punish in each case; and 5) places where the events alleged as part of the conspiracy took place. Where several of these factors differ between the conspiracies, the conclusion follows that the alleged illegal conspiracies are separate and distinct offenses.

*Id.* at 1256-57 (internal citations omitted).

### _Time_

This factor weighs against Defendant Prater. The timeframe of the conspiracy charged in case 152 is "from in or around December of 2018, continuing through in or around April of 2019." (Case 152, R. 1, Indictment). The timeframe of the conspiracy charged in case 151 is "from on or about July 15, 2018, through on or about November 22, 2019." (Case 151, R. 78, Superseding Indictment). Accordingly, the relatively brief conspiracy in case 152 is subsumed by

48

the broader, more extensive conspiracy in case 151. Courts have found that such a subsummation is not evidence of a single conspiracy.

In *United States v. Lacey*, No. 92-1186, 1993 U.S. App. LEXIS 41526, *16 (6th Cir. Jan. 5, 1993), the Sixth Circuit held that a pair of drug conspiracies charged in separate indictments did not violate double jeopardy. In that case, the timeframe of the conspiracy alleged in the Fifth Superseding Indictment ("FSI") (June 1987 – March 29, 1991) subsumed the timeframe of the conspiracy alleged in the initial indictment (May 1 – May 2, 1989). *Id.*

As to the first *Sinito* factor of time, the Sixth Circuit held that, though the FSI "overlaps and subsumes the time period in the initial indictment, [t]his is not conclusive evidence of a single conspiracy." *Id.; see also United States v. Wheeler*, 535 F.3d 446, 456 (6th Cir. 2008) (determining that the time factor weighed against a double jeopardy claim where one indictment set forth a drug conspiracy lasting from 1990 to April 2003 and the other indictment set forth a drug conspiracy beginning in 2002); *United States v. Inmon*, 594 F.2d 352, 354 (3rd Cir. 1979) *cert. denied*, 444 U.S. 859 (1979) (finding two separate conspiracies where there was a 10-month overlap between conspiracies charged in the first and second indictments, and observing "time frames and personnel can overlap in separate criminal agreements. In a metropolitan area such as Pittsburgh, it is possible for more than one scheme involving the distribution of heroin to exist."). Similar to Pittsburgh, Knoxville is a metropolitan area in which it is possible for more than one scheme involving drug distribution to exist. Accordingly, this factor weighs against a finding of a single conspiracy.

### ***Co-Conspirators***

This factor weighs against Defendant Prater. Defendant Prater is the only conspirator mentioned in both conspiracies. *Compare* (Case 152, R. 1, Indictment, and R. 15 Plea Agreement, Mahlon Prater is only person named) with (Case 151, R. 78, Superseding Indictment

49

names Mahlon Prater and 11 others). In similar circumstances, courts have repeatedly held that it weighs against one conspiracy. *See, e.g.*, *Sinito*, 723 F.2d at 1257 (that the defendant is the only party charged in both indictments lends support to the conclusion that there are two conspiracies); *Lacey*, 1993 U.S. App. LEXIS 41526 at *16-17 (defendant is the only individual named in both indictments and noting that other courts have found no double jeopardy bar even in "cases where there is considerable overlap of defendants") (citations omitted); *United States v. Toaz*, 59 F. App'x 94, 101 (6th Cir. 2003) ("Toaz is the only conspirator that is mentioned in both indictments . . . the overlap of a single defendant does not indicate a single conspiracy"); *United States v. Goff*, 187 F. App'x 486, 492 (6th Cir. 2006) (other than Goff, "there is no overlap whatsoever" between the conspirators named in the first and second indictments). Since Defendant Prater is the only defendant common to both indictments, therefore this factor weighs against a finding of a single conspiracy.

### ***Offenses Charged in the Indictments***

This factor weighs against Defendant Prater. As stated above, both cases allege a drug conspiracy in violation of 21 U.S.C. § 846: case 152 charges Defendant Prater with one count of conspiring to possess with intent to distribute a quantity of crack, conversely, case 151 charges Defendant Prater with conspiring to distribute 50 grams or more of methamphetamine, fentanyl, Roxicodone, Xanax, marijuana, buprenorphine, and heroin. Notably, though not dispositive, crack is not an object of the conspiracy in case 151.

Moreover, Defendant Prater is also charged with three additional crimes in the superseding indictment in case 151:   aiding/abetting the possession of firearms in furtherance of the drug trafficking conspiracy; a substantive count of distribution of 50 grams or more of methamphetamine; and a separate count of possession of firearm in furtherance of the substantive drug distribution offense. Other cases have found two conspiracies in similarly

charged drug cases, even when, unlike here, there are no additional firearms offenses in the second indictment. *See Lacey*, 1993 U.S. App. LEXIS 41526 at *17 (though both indictments charged violations of 21 U.S.C. § 846, "the initial indictment charged conspiracy to possess with intent to distribute and distribute cocaine while the fifth superseding indictment embraces not only cocaine, but also marijuana"); *Toaz*, 59 F. App'x at 101 (noting that though Toaz was charged with methamphetamine offenses in both indictments, "the Indiana indictment describes the conspiracy as involving not only methamphetamine, but also cocaine, LSD, marijuana, hashish and valium"). This factor weighs against a finding of a single conspiracy.

### *Nature and Scope of the Activity which the Government Sought to Punish in Each Case*

This factor weighs against Defendant Prater. The conspiracy in case 152 is vastly different in nature, size, and scope when compared to the conspiracy in case 151. The conspiracy in case 152 involved only 28 – 112 grams of crack (case 152, R. 15, Plea Agreement at 2), whereas the conspiracy in case 151 involved multiple kilograms of methamphetamine, as well as significant quantities of fentanyl, Roxicodone, and Xanax pills. (case 151, R. 128, Hounschell Plea Agreement at 7). The conspiracy in case 152 involved Defendant Prater working with a limited number of lower-level east Knoxville crack dealers, with Defendant Prater in turn selling small amounts of crack to an FBI confidential informant in east Knoxville. (case 152, R. 15, Plea Agreement at 2). Conversely, the large-scale conspiracy charged in case 151 includes different drugs in far larger quantities, sourced from Nashville and California via a Mexican drug distributor housed in a middle Tennessee prison with Defendant Ronald Turner, and which were subsequently distributed in several locations, including, Knoxville, Lenoir City, Cleveland, and Chattanooga, Tennessee. *See generally* case 151, R. 128, Hounschell Plea Agreement at 4-7; R. 135, Curtis Plea Agreement at 2-3; R. 115, Cooper Plea Agreement at 3-4.

This case closely resembles the Sixth Circuit's decision in *Lacey*, in which the Sixth

Circuit found two conspiracies and, thus, no double jeopardy violation:

> In this case, the two conspiracies charged against defendant Lacey involve different acts. The first prosecution involved a single "buy/bust" sale of cocaine in Detroit, as a result of negotiations originating in Cleveland. On the other hand, the [Fifth Superseding Indictment] alleges a large-scale conspiracy, involving mainly the movement of cocaine and marijuana between Houston and Detroit as well as the distribution of the drugs in Detroit.

*Lacey*, 1993 U.S. App. LEXIS 41526 at *17-18. That Defendant Prater's plea agreement says he

engaged in six controlled buys, as opposed to one, before being busted is of no moment. Like

*Lacey*, the difference in the drug suppliers, co-conspirators, and geographical locations, as well

as the contrasts in nature, scope, and significance between the conspiracies in cases 152 and 151,

weigh in favor of a finding that the cases involve two separate conspiracies.

### *Places Where Events Took Place*

Like the preceding *Sinito* factors, this last factor also weighs against Defendant Prater.

Defendant Prater "makes much ado about" the fact that the conspiracies in cases 152 and 151

both allege to have occurred in the Eastern District of Tennessee. *Sinito*, 723 F.2d at 1258.

However, as described above, the diversity of geographical locations of drug supply and

distribution in case 151 is far more significant than the handful of insular, east Knoxville crack

deals involved in case 152. Regardless, even without these significant differences in locations

between the two conspiracies, *Sinito* found this last factor, "standing alone, [to be] of minimum

significance." *Id*. at 1258-59.

In sum, the five *Sinito* factors all weigh in favor of a finding that these cases involved two

separate conspiracies. Thus, under the totality of the circumstances, "the separate

indictments…do not pose a double jeopardy problem." *Toaz*, 59 F. App'x 102. Defendant

Prater's motion to dismiss the superseding indictment against him should be denied.

## No Multiplicitous Counts in the Superseding Indictment

Finally, Defendant Prater's claim that the Fifth Amendment's proscription against multiplicitous indictments prevents him from being convicted of both Count Two (aiding/abetting the possession of firearms in furtherance of the drug trafficking conspiracy in Count One) and Count Seven (possession of a firearm in furtherance of the substantive drug distribution crime in Count Six) is without merit and should be denied.

The Superseding Indictment's two § 924(c) charges against Defendant Prater are grounded in separate predicate acts: Count Two, which alleges that the named defendants aided and abetted each other in the possession of firearms in furtherance of a specified drug trafficking crime, is predicated on the drug trafficking conspiracy in Count One; Count Seven, which alleges that Defendant Prater possessed a firearm in furtherance of a specified drug trafficking crime, is predicated on the separate, substantive drug distribution crime in Count Six.

It is well-settled that multiple § 924(c) convictions and sentences are acceptable if based on separate predicate acts. *See United States v. Burnette*, 170 F.3d 567, 572 (6th Cir. 1999) ("It is now firmly established that the imposition of separate consecutive sentences for multiple § 924(c) violations occurring during the same criminal episode are lawful."); *see also United States v. Nabors*, 901 F.2d 1351, 1357-58 (6th Cir. 1990) (affirming separate § 924(c) convictions for using firearm during drug trafficking crime and using firearm during crime of violence where Nabors shot a federal agent searching his apartment where drugs were found); *United States v. Graham*, 275 F.3d 490, 519-20 (6th Cir. 2001) (affirming separate § 924(c) convictions where the underlying offense for one conviction was the inchoate crime of conspiring to commit federal offenses in violation of 18 U.S.C. § 371 and the other was a substantive drug-trafficking offense). Additionally, "924(c)'s unit of prosecution is the

53

underlying offense, not the number of firearms." *United States v. Taylor*, 13 F.3d 986, 994 (6th Cir. 1994).

That separate predicate offenses are committed during the same course of conduct does not preclude separate § 924(c) charges, so long as the predicate offenses (1) do not "consist of identical conduct," and (2) are not "committed simultaneously." *Graham*, 275 F.3d at 521; *see also United States v. Clark*, 41 F. App'x 745, 749 (6th Cir. 2002) ("Simply recharacterizing separate offenses as a single pattern or a single course of conduct does not allow a defendant to escape a consecutive sentence."). The double jeopardy clause of the Fifth Amendment is not even violated by multiple § 924(c) charges that list the same underlying conspiracy as a predicate, so long as each § 924(c) charge is "also tied to a unique [substantive] count." *United States v. Ford*, 761 F.3d 641, 656-67 (6th Cir. 2014).

The proof of Defendant Prater's aiding and abetting the § 924(c) violation in Count Two is broad and extensive because it occurred on various days and in various ways from July 15, 2018 – September 6, 2019, all of which is tied to the conspiracy charged in Count One. Conversely, the proof of Defendant Prater's § 924(c) violation in Count Seven is uniquely tied to the substantive drug distribution charge that is alleged to have occurred in or around the end of July 2019 in Count Six. Accordingly, because Counts Two and Count Seven do not violate the Fifth Amendment, Defendant Prater is properly charged with them and may be convicted and sentenced on both counts.

4. **RESPONSE TO DEFENDANT GILMORE'S OBJECTION TO HIS SENTENCING ENHANCEMENT FOR FELONY CARJACKING (R. 208)**

This "objection" to the recidivist sentencing enhancement applied to any sentence Defendant Gilmore may receive as a result of any conviction in this case is premature and is more appropriately raised after trial and before sentencing.

54

The United States disagrees with Defendant Gilmore's contention that his Tennessee carjacking conviction does not qualify for a sentencing enhancement, pursuant to 21 U.S.C. § 841(b). Moreover, the United States will be prepared at sentencing to prove the existence of the prior conviction and to show that it qualifies as a serious violent felony for purposes of 21 U.S.C. § 841, and will supplement its position with applicable *Shepard* documents related to the Tennessee carjacking conviction. *Shepard v. United States*, 544 U.S. 13 (2005). Finally, the United States notes that Defendant Gilmore has not challenged the adequacy of the 21 U.S.C. § 851 notice (R. 96, Notice of Enhancement) and, therefore, Defendant Gilmore appears to be aware of the prior conviction that the government intends to use to enhance his sentence.

5. **RESPONSE TO DEFENDANT BIBBS' MOTION FOR *BRADY* AND SPECIFIC ITEMS OF IMPEACHMENT (R. 214)**

Defendant Bibbs requests numerous items of information that purportedly fit into several categories of exculpatory or impeachment information, including:

- witness benefits (R. 214, Motion ¶¶ 1 and 2);

- false or inadequate witness identifications (*Id.* at ¶ 3);[12]

- prior inconsistent witness statements (*Id.* at ¶ 4);

- witness criminal histories, arrests, prior bad acts, and even income tax records (*Id.* at ¶¶ 5 and 6);

- witness mental, physical, and substance abuse history (*Id.* at ¶¶ 7, 10, and 11);

- witness polygraph results (*Id.* at ¶ 8); and

- witness bias (*Id.* at ¶ 9).

---

[12] Defendant Bibbs does not specify how this type of information (*i.e.,* "I couldn't see the killer's face.") is relevant in this case.

55

At the outset, the United States asserts that other federal Circuit Courts of Appeal have rejected such sweeping requests made by Defendant Bibbs – requests that demand the prosecution in this case go hunting for information contained in the files of, for example: "any other [local, state, or federal] law enforcement agency," (*Id.* at ¶ 1); "any state law enforcement agency or the United States Government," (*Id.* at ¶ 2); "probation files in any state or federal district," (*Id.* at ¶ 6).

Such an unlimited conception of what constitutes the "prosecution team" has been regularly rejected by other courts:

> [The] knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'

*United States v. Avellino*, 136 F.3d 249, 255-56 (2d Cir. 1998), citing *United States v. Gambino*, 835 F. Supp. 74, 95 (E.D.N.Y. 1993), *aff'd*, 59 F.3d 353 (2d Cir. 1995), *cert. denied*, 517 U.S. 1187 (1996).

Similarly, in *United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993), *cert. denied*, 511 U.S. 1070 (1994), the Second Circuit refused to impute to the AUSAs prosecuting that action knowledge of reports prepared by FBI agents who were "uninvolved in the investigation or trial of the defendants-appellants." *Id.* at 949 ("We will not infer the prosecutors' knowledge simply because some other government agents knew about" the evidence.). In *United States v. Quinn*, 445 F.2d 940 (2d Cir.), *cert. denied*, 404 U.S. 850 (1971), the Second Circuit refused to impute the knowledge of a Florida prosecutor to an AUSA in New York, rejecting as "completely untenable [the] position that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor.'" *See also United States v. Pelullo*, 399 F.3d 197, 217

(3rd Cir. 2005) (because the "government is not under an obligation to obtain and disclose all information in the possession of other arms of the government that are not involved in the particular prosecution," the prosecution was under no obligation to "ferret out evidence from another pending proceeding with a tenuous connection to the prosecution.").

Defendant Bibbs' sweeping demands aside, to the extent that the government's witnesses may be impeached because they have entered plea agreements with the government, received reductions in their sentences, or promised benefits in exchange for their cooperation with the government, the government will provide the defendants with that information pursuant to ¶ E of the Court's Order on Discovery and Scheduling. R. 11, Order. Moreover, some of this information is available in plea agreements filed publicly with the clerk. Also, some of defendant's requests, including those listed in ¶ 3 of his motion, are prohibited by Rule 16(a)(2) in that this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case. Such a request appears to invade the attorney work product of the AUSAs prosecuting this case. *See In re Antitrust Grand Jury*, 805 F.2d 155, 163-64 (6th Cir. 1986) (holding that attorney work product is ordinarily protected from discovery by the opposing party). It is also important to keep in mind that the Sixth Circuit has held that "[t]he discovery afforded by Federal Rule of Criminal Procedure 16 is limited to the evidence referred to in its express provisions, *United States v. Presser*, 844 F.2d 1275, 1285 (6th Cir. 1988)[.]" *United States v. Warshak*, 631 F.3d 266, 275 (6th Cir. 2010).

Most of the information sought in Defendant Bibbs' motion is the subject of this Court's Order on Discovery and Scheduling (R. 11, ¶ E). Defendant Bibbs' request for the criminal records of government witnesses is addressed by paragraph F of the Order on Discovery and

Scheduling. *Id.* Defendant Bibbs' request for material to be used in impeachment of government witnesses is addressed by paragraph E of the same Order. *Id.*

The government shall reveal to the defendant and permit inspection and copying of all information and material known to the government which may be favorable to the defendant on the issues of guilt or punishment within the scope of *Brady v. Maryland*, 373 U.S. 83 (1963), *United States v. Agurs*, 427 U.S. 97 (1976) (exculpatory evidence), and *United States v. Bagley*, 473 U.S. 667 (1985) (impeachment evidence). Timing of such disclosure is governed by *United States v. Presser*, 844 F.2d 1275 (6th Cir. 1988).

Thus, the Court, via its Order on Discovery & Scheduling, has already ordered the government to turn over materials within the scope of *Brady*, with timing of such disclosures governed by *United States v. Presser*, 844 F.2d 1275 (6th Cir. 1988).

The remainder of the information sought, to the extent it exists, is not in the possession of the prosecution team. For example, the prosecution team is not in possession witnesses' medical, psychological, and substance abuse treatment records. Moreover, the prosecution team cannot even obtain those types of records unless they are necessary to an active criminal investigation *of those witnesses*. Likewise, drug screening information and particularly screens obtained by the courts (including this Court), are not in the possession of the prosecution team, and cannot be obtained without court approval. Law enforcement agencies typically do not administer drug screens and the United States is unaware of any drug screening performed by law enforcement during this investigation. Regarding these sorts of information, Defendant Bibbs may inquire of witnesses at trial to the extent permissible under the Federal Rules of Evidence.[13]

---

[13] To the extent some witnesses might have been asked about their drug use or abuse history during interviews or proffer sessions, the reports of those interviews will be turned over in accordance with the requirements of the Jencks Act.

58

In short, the United States is aware of its *Brady* obligations and will adhere to those obligations. Nothing in this response, however, should be deemed to be an acquiescence or agreement that some or all of the information requested actually constitutes *Brady* information, and the United States specifically reserves the right to dispute whether any of the information requested by Defendant Bibbs actually qualifies as *Brady* information in the future.

## 6. RESPONSE TO DEFENDANT BIBBS' MOTION FOR A BILL OF PARTICULARS (R. 215)

### *Legal Standard*

Federal Rule of Criminal Procedure 7 permits a district court, in its discretion, to "direct the government to file a bill of particulars." Fed. R. Crim. P. 7(f). A bill of particulars is meant "to minimize surprise and assist the defendant in obtaining the information needed to prepare a defense and to preclude a second prosecution for the same crimes." *United States v. Salisbury*, 983 F.2d 1369, 1375 (6th Cir. 1993); *accord United States v. Birmley*, 529 F.2d 103, 108 (6th Cir. 1976). "It is not meant as a tool for the defense to obtain detailed disclosure of all evidence held by the government before trial," *Salisbury*, 938 F.2d at 1375, and it "is not intended as 'a means of learning the government's evidence and theories.'" *United States v. Musick*, 291 F. App'x 706, 724 (6th Cir. 2008) (*quoting* 1 Charles Allen Wright & Arthur R. Miller, Federal Practice & Procedure § 129 (4th ed. 2011)); *accord United States v. Gabriel*, 715 F.2d 1447, 1449 (10th Cir. 1983) ("A bill of particulars may not be used to compel the Government to disclose evidentiary details or 'to explain the legal theories upon which it intends to rely at trial.'" (*quoting United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980))); *Hemphill v. United States*, 392 F.2d 45, 49 (8th Cir. 1968) ("Acquisition of evidentiary detail is not the function of the bill of particulars."). "Thus, the test in ruling on a motion for a bill of particulars is whether providing such details is necessary to the preparation of the defense and avoidance of

59

prejudicial surprise." *Musick*, 291 F. App'x at 724 (emphasis added); *accord United States v. Matos-Peralta*, 691 F. Supp. 780, 791 (S.D.N.Y. 1988) ("The ultimate test must be whether the information sought is necessary, not whether it is helpful.").

### *Defendant Bibbs Seeks Granular Details of the Prosecution's Case Against Him*

Contrary to the law cited above, Defendant Bibbs persists in seeking an unjustified and granular level of detail as to all of the prosecution's evidence that it will offer against him in its case-in-chief, and even at sentencing. R. 215, Motion at 1-6. However, the Superseding Indictment, along with the generous discovery provided to Defendant Bibbs, provides ample tools for him to defend himself at trial. "The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" Fed. R. Crim. P. 7(c)(1). As a general rule, an indictment is constitutionally adequate so long as it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001) (quoting *Hamling*). The Superseding Indictment in this case satisfies Rule 7(c)(1) and the Supreme Court's directive in *Hamling*.

In the Sixth Circuit, the touchstone for whether a bill of particulars should issue is "whether the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges to enable him to prepare for trial." *United States v. Kendall*, 665 F.2d 126, 134 (7th Cir. 1981) (*quoting United States v. Roya*, 574 F.2d 386, 391 (7th Cir.), *cert. denied*, 439 U.S. 857 (1978)). More specifically, "[t]he Sixth Circuit has clearly held that a bill of particulars is not intended as a means of learning the government's legal theories." *Salisbury*, 983 F.2d at 1375. Likewise, "a bill of particulars is not to be used as a general discovery device." *Addonizio*, 451 F.2d 49, 64 (3d Cir. 1971), *cert. denied*, 405 U.S. 936 (1972); *see also United*

60

*States v. Hayes*, 884 F.2d 1393, 1989 WL 105937, \*4 (6th Cir. 1989). To that end, a defendant is

not entitled to a bill of particulars if his purpose is, as Defendant Bibbs seeks to do here, to

obtain a list of the prosecution's witnesses or to discover all of the overt acts that might be

proven at trial. *See Salisbury*, 983 F.2d at 1375; *United States v. McCullah*, 745 F.2d 350, 353

(6th Cir. 1984); *United States v. Conder*, 423 F.2d 904, 910 (6th Cir.), *cert. denied*, 400 U.S. 958

(1980); *see also United States v. Largent*, 545 F.2d 1039, 1043 (6th Cir. 1976). Nor is the

prosecution required to furnish the names of all other co-conspirators. *See United States v.*

*Crayton*, 357 F.3d 560, 568 (6th Cir. 2004). As stated by the Seventh Circuit in approval of a

decision coming from the Fifth Circuit, "[t]he defendant's constitutional right is to know the

offense with which he is charged, not to know the details of how it will be proved." *Kendall*, 665

F.2d at 135, *citing United States v. Freeman*, 619 F.2d 1112, 1118 (5th Cir. 1980).

Moreover, the United States is not obligated to provide a bill of particulars informing a

defendant as to when the defendant is alleged to have joined the conspiracy, the dates of specific

overt acts, or precise dates, times and locations relevant to the charges in an indictment. *See*

*United States v. Robinson*, 390 F.3d 853, 867 (6th Cir. 2004) (holding that an indictment alleging

a conspiracy from April 1999 to August 2004 was sufficiently detailed that no bill of particulars

was required); *United States v. Torres*, 901 F.2d 205, 234 (2nd Cir. 1990) (holding that the trial

court did not abuse its discretion in denying motion for bill of particulars that requested specific

dates, times and locations of alleged acts of coconspirators); *see also United States v. Ellender*,

947 F.2d 748, 756 (5th Cir. 1991); *United States v. Armocida*, 515 F.2d 49, 54 (3rd Cir. 1975)

(United States need not specify the dates, times, and exact locations of various conspiratorial

acts).

The Superseding Indictment alleges the conspiracy's timeframe, and an indictment charging a count of conspiracy is sufficiently precise as to the timeframe if the operative period of the conspiracy is set out. *United States v. Edmonson*, 962 F.2d 1535, 1541 (10th Cir. 1992); *United States v. Harrison-Philpot*, 978 F.2d 1520 (9th Cir. 1992) (indictment alleging conspiracy began "at a date unknown but as early as March 9, 1988, and continuing through on or about April 19, 1988" was sufficient); *United States v. Hallock*, 941 F.2d 36, 40 (1st Cir. 1991) (indictment alleging conspiracy occurred "in or about 1988, in the District of Maine and elsewhere" was not defective); *United States v. Brown*, 720 F.2d 1059, 1076 (9th Cir. 1983) (indictment alleging that "transaction occurred during the first part of 1976" not deficient); *United States v. Rohrer*, 708 F.2d 429, 435 (9th Cir. 1983) (approving indictment alleging that conspiracy "extended until 'at least' 1980").

### *Extensive, Indexed Discovery Provided to Defendant Bibbs*

The discovery in this case is extensive (and indexed for ease of navigation), and counsel for Defendant Bibbs has already manifested a facility in navigating it, especially as it pertains to his client. *See*, R. 219, Memorandum at 2 (describing his review and analysis of more "than 4,000 recorded phone calls and text messages [and]…cellphone extraction databases").

The Sixth Circuit has held that "[i]f there has been full disclosure by the Government, as there was in the instant case, the need for a bill of particulars is obviated." *United States v. Martin,* 822 F.2d 1089 (Table), 1987 WL 38036, *2-3 (6th Cir. July 14, 1987), *citing United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir.), *cert. denied*, 444 U.S. 979 (1979); *see also United States v. Pendergrass*, No. 3:06-00147, 2006 WL 3098871, at *2 (M.D. Tenn. Oct. 30, 2006), *citing United States v. Sorich*, 427 F. Supp. 2d 820, 838 (N.D. Ill. 2006), *United States v. Santiago*, 174 F. Supp. 2d 16, 36 (S.D.N.Y. 2001) (holding that a court should also consider the availability of other sources of information to the defendant, including the discovery provided,

when determining whether a bill of particulars should issue); *United States v. Chalmers*, 410 F. Supp. 2d 278, 286 (S.D.N.Y. 2006) ("the Government has provided extensive discovery, minimizing the need for a bill of particulars"); *United States v. Kemp*, No. CRIM.A.04-370, 2004 WL 2757867 at *8 (E.D. Pa. Dec. 2, 2004) (collecting cases) ("Courts are especially reluctant to direct the filing of a bill of particulars when the government has provided the defendant with extensive pretrial discovery"). District courts within the Sixth Circuit have extended this reasoning to situations where, as here, the United States has been cooperative throughout the discovery process and turned over extensive materials.

    *United States v. Watts*, No. 04-20223B, 2007 WL 1231669 at *3 (W.D. Tenn. Apr. 25, 2007), is particularly instructive on this point relative to a bill of particulars request.

> Nor is the Court willing to order the Government to provide Defendants with a roadmap through all of the documents it has produced especially in light of the fact that the Government has been cooperative in discovery and produced the documents in a searchable format. For the same reasons, the Court is not persuaded that Defendants face a danger of surprise at trial. It appears that Defendants already have all of the information they have requested in their possession including the Medicare regulations.

*Id.* The Eastern District of Tennessee reached the same conclusion in several cases. In a tax evasion case, *United States v. Cowan*, No. 3:09–CR–37, 2009 WL 2613950 at *6 (E.D. Tenn. Aug. 24, 2009), this Court held as follows.

> In the present case, the United States provided a computer disk and hard copies of documents supporting its claims of overt acts . . . Moreover, the indictment is quite specific in describing the one charge of evasion, listing the five tax years for that charge, and describing the overt acts.   It also lists each specific year for which he failed to make an income tax return and his gross income for that year. Defendant has enough information to inform him of the charges against him, protect him from double jeopardy, and enable him to prepare for trial. Defendant's motion for a bill of particulars is not well taken and shall be denied.

*Id.* And in an environmental case, *United States v. Sawyer*, No. 2:11–CR–82, Doc. 109 at 6 (E.D. Tenn. Feb. 11, 2013), this Court maintained a similar holding.

> [A]lthough there is a significant amount of discovery in this case, the Government has provided the discovery in a format that is readily loadable into a searchable format. The Government also provided an index of these materials. Therefore, the Superseding Indictment is sufficient enough to avoid surprise at trial, assist Defendant Sawyer in obtaining information needed to prepare his defense, and preclude a second prosecution for the same crimes. *See Salisbury*, 983 F.2d at 1375.

*Id.* And to the extent the defendant is seeking "pinpoint discovery," this Court has denied similar motions in a variety of cases, including a cocaine conspiracy case, *United States v. Gonzalez*, No. 3:13–CR–161, 2014 WL 2574765 at *3 (E.D. Tenn. June. 6, 2014).

> [T]he circumstances of this case do not require the Court to exercise its discretion in regulating discovery to require the requested designation of pinpoint discovery. Initially, the Court questions whether the Government can effectively isolate certain discovery that applies only to a specific Defendant. The Defendants in this case are charged [Doc. 3, Count 1] with conspiring to distribute and possess with intent to distribute cocaine and crack cocaine over approximately sixteen months. It is well settled that "the overt act of one partner in crime is attributable to all," as long as the overt act was performed in furtherance of the conspiracy. *Pinkerton v. U.S.*, 328 U.S. 640, 645 (1946). Accordingly, the Court finds that knowing what parts of the discovery the Government contends are overt acts committed by a particular Defendant will not alleviate the Defendants' need to review those overt acts allegedly committed by their Codefendants. In other words, even if the Defendants received pinpoint discovery, they would still have to review the other discovery to prepare for trial. For this reason, the Court questions whether the provision of pinpoint discovery would actually reduce the legal fees of appointed counsel, as suggested by the Defendants. Furthermore, in the instant case the Government has taken steps to make the voluminous discovery more manageable for the Defendants. The Government states that in addition to making all discovery available to each Defendant, it has designated some discovery that is specific and relevant to a particular Defendant in order to encourage timely and efficient resolution of the case. Thus, the Court finds that the Defendants have received some "pinpoint" discovery already.

*Id.*

Here, as in *Watts, Cowan, Sawyers,* and *Gonzalez*, the United States has been very cooperative in providing extensive and indexed discovery. The United States facilitated this production on USB drives and limited hard paper copies in some instances. Additionally, the government has "designated some discovery that is specific and relevant" to individual

64

defendants. *See* Ex. 8, Discovery Letter with screen capture showing indexed file structure of the discovery contained on USB drive.

As in all of the in-circuit cases discussed above, the United States has been cooperative in furnishing discovery and in guiding the defendants in reviewing the same; the discovery has been provided in an indexed format; and most, if not all, of the information the defendants seek through a bill of particulars is already available to them in this discovery. As such, the extensive, indexed discovery already provided by the United States obviates the need for a bill of particulars.

### 7. RESPONSE TO DEFENDANT BIBBS' MOTION FOR DISCLOSURE OF MATERIAL WITNESSES (R. 217)

The Court need not be detained long in denying this motion as Defendant Bibbs made no attempt to articulate why he needs the identities (and addresses) of confidential informants or cooperating witnesses revealed. *See* R. 219, Motion (citing *Roviaro* and then summarily demanding the "names and addresses of all persons known to the government [] to have been present at the times and places of the offenses alleged in the superseding indictment[.]").

The government has the privilege "to withhold from disclosure the identity of persons who furnish information of violations of the law to officers charged with enforcement of that law." *Roviaro v. United States*, 353 U.S. 53, 59, 77 (1957). "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Id*.

To be sure, this law enforcement privilege is not absolute. Where the disclosure of an informant's identity is "relevant and helpful to the defense of an accused, or is essential to a fair

determination of cause," however, "the privilege must give way." *Id*. at 60-61. In *Roviaro*, the Supreme Court expressed that "no fixed rule with respect to disclosure is justifiable." *Id*. at 62. "Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id*.

Critically for this case, the Sixth Circuit places the burden on the defendant to demonstrate "how disclosure of the informant would substantively assist his defense." *United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1992). Defendant Bibbs makes no such showing here – he simply demands "names and addresses." Due to the brevity of his motion, it is unclear which "witness" names and addresses he wants. It may be that Defendant Bibbs is referring to the confidential informant (CI) referenced the affidavit in support of the search warrant for the trap house operated by Defendant Bibbs at 510 Gillespie Street. Assuming he is referring to that CI, his motion still fails because that CI, as shown in the affidavit, was merely a reliable tipster and not a participant in the criminal activity, nor was the CI present at the time of Defendant Bibbs' arrest, along with Defendant Billips and Carmen Noble who were also arrested, on July 25, 2019. *See United States v. Sales*, 247 F. App'x 730, 734 (6th Cir. 2007) ("We usually deny disclosure when the informer was not a participant" but rather, was a mere tipster or introducer.); *United States v. Jackson*, 990 F.2d 251, 254 (6th Cir. 1993) (Finding district court had a valid basis for denying disclosure where the informant was not a participant in the offense with which the defendant was charged, and was not present when the defendant was arrested.).

To the extent Defendant Bibbs is seeking a witness list for this jury trial, his motion should be denied. As a general rule, the government is not required to disclose the names of its witnesses before trial. *See United States v. Perkins*, 994 F.2d 1184, 1190 (6th Cir.), *cert. denied*, 510 U.S. 903 (1993); *United States v. McCullah*, 745 F.2d 350, 353 (6th Cir. 1984); *see also*

66

*United States v. Turner*, 91 F. App'x 489, 491 (6th Cir. 2004) (holding that a "defendant in a non-capital case . . . is not entitled to know in advance of trial who will testify for the government"). Finally, as further support to deny this motion, the Court should recall the open hostility and disdain Defendant Bibbs expressed toward those who cooperate with law enforcement. R. 167, Government Memorandum in Support of Detention at 7-8.

8. **RESPONSE TO DEFENDANT BIBBS' MOTION FOR A PRETRIALHEARING ON THE EXISTENCE OF A CONSPIRATORIAL AGREEMENT AND THE CONNECTION THERETO OF DEFENDANT (R. 218, 219)**

Defendants are charged in the Superseding Indictment with a wide-ranging conspiracy to distribute controlled substances, conspiracy to commit money laundering, possession of firearms in furtherance of drug trafficking, and, for several defendants, including Defendant Bibbs, being felons in possession of firearms. Anything any of those co-conspirators said to one another in furtherance of the conspiracy could be admissible at trial under the co-conspirator exception to the hearsay rule.

The Sixth Circuit has held that "statements have been found to be in furtherance of a conspiracy where they . . . apprise other co conspirators of the status of the conspiracy," and that "a statement may be in furtherance of the conspiracy even if not exclusively, or even primarily, made to further the conspiracy." *United States v. Henderson*, 307 F. App'x 970, 977 (6th Cir. 2009) (internal citations omitted). Similarly, the Third Circuit explained that "statements made to inform others of the status of the conspiracy only further the conspiracy if the addressees are also interested in the status of the conspiracy." *United States v. Weaver*, 507 F.3d 178, 186 (3d Cir. 2007).

As the Sixth Circuit has explained,

A statement is made in furtherance of a conspiracy if it was intended to promote conspiratorial objectives; it need not actually further the conspiracy.

This requirement is satisfied when the statements are made to apprise a co-conspirator of the progress of the conspiracy, to induce his continued participation, or to allay his fears. Statements that prompt a co conspirator to act in a [manner] that facilitates the carrying out of the conspiracy, or that serve as a necessary part of the conspiracy by concealing or impeding the investigation, are also made in furtherance of the conspiracy.

*United States v. Martinez*, 430 F.3d 317, 327 (6th Cir. 2005) (internal citations and quotation marks omitted).

The statements made amongst the co-conspirators in this case clearly fall within the exception to the hearsay rule. However, the Sixth Circuit has held that "before the government can take advantage of the hearsay exception, it must show by a preponderance of the evidence (1) that a conspiracy existed, (2) that the defendant against whom the hearsay is offered was a member of the conspiracy and (3) that the hearsay statement was made in the course and in the furtherance of the conspiracy." *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979). Such a finding must be made by the district court. *Id*. The Sixth Circuit has outlined three alternative methods by which the district court can make a determination as to the admissibility of hearsay statements under the co-conspirator exception to the hearsay rule. The district court may: (1) conduct a pretrial mini-hearing outside of the presence of the jury and listen to the proof of the conspiracy offered by the United States before making the necessary finding; (2) require the United States to produce non-hearsay evidence of the conspiracy during the course of the trial before making the necessary finding as to the admissibility of the hearsay; or (3) admit the hearsay statements subject to a later demonstration of their admissibility by a preponderance of the evidence. *Id*. at 152-53. The Sixth Circuit noted in *Vinson* that the alternative of a pretrial hearing "has been criticized as burdensome, time consuming and uneconomic . . ." but left that alternative within the discretion of the district court. *Id*. at 152.

68

Indeed, the third option articulated above is the more practical approach, and the one customarily utilized in this district. *See, e.g., United States v. Hofstetter*, 2018 WL 813254, at *13-14 (E.D. Tenn., Shirley, M.J., 2018); *United States v. Joiner*, 2016 WL 2968012, at *11 (E.D. Tenn., Shirley, M.J., 2016); *United States v. Kincaid*, 2013 WL 5488524, at *6 (E.D. Tenn, Varlan, J., 2013); *United States v. Bozeman*, 2012 WL 1071207, at *14 (E.D. Tenn., Shirley, M.J., 2012); *United States v. Neal*, 2012 WL 1357745, at *3 (E.D. Tenn., Shirley, M.J., 2012); *United States v. Whaley*, 2011 WL 3843699, at *12 (E.D. Tenn., Shirley, M.J., 2011); *United States v. Flannery*, 2010 WL 3083532, at *4 (E.D. Tenn, Guyton, M.J., 2010); *United States v. Martin*, 2008 WL 152900, at *3 (E.D. Tenn, Phillips, J., 2008); *United States v. Angeles*, 2008 WL 149030, at *4 (E.D. Tenn., Shirley, M.J., 2008); *United States v. Jordan*, 2007 WL 1849985, at *35 (E.D. Tenn., Guyton, M.J., 2007); *United States v. Corona*, 2007 WL 1655889, at *2 (E.D. Tenn., Guyton, M.J., 2007). As evidenced by the collected cases (which represent just a small sampling of the cases in which judges in this district have denied *Enright* hearings), such a practice historically has not produced adverse effects or unnecessary mistrials in this district.

By avoiding the unnecessary requirement of a pretrial hearing requiring the government to demonstrate the existence of a conspiracy the district court avoids burdensome, time consuming and uneconomic efforts which are only duplicated later at trial. Furthermore, a pretrial hearing on this matter would allow the defendant to circumvent the narrow and specific rules of pretrial discovery, to ascertain the minutiae of the government's evidence, contrary to the legislative intent of Rule 16 of the Federal Rules of Criminal Procedure and the Jencks Act, 18 U.S.C. §3500. *See generally United States v. Presser*, 844 F.2d 1275 (6th Cir. 1988).

Moreover, in a case like this one where the conspiracy centered around violent gang members organizing and working together to engage in armed drug trafficking in various cities

69

and towns in the Eastern District of Tennessee, an *Enright* hearing would be tantamount to the trial itself. A significant portion of the trial will be dedicated to what the co-conspirators said to each other, what they said to others, and the actions they took in response. Requiring the functional equivalent of a trial-before-the-trial would be manifestly unfair to the interests of justice, not to mention wasteful of judicial time and resources.

Defendant Bibbs seems to argue that he cannot be part of the charged conspiracy because he did not conspire with *everyone* in the Superseding Indictment. *See*, R. 219, Memorandum at 2 ("there is no evidence in the discovery provided by the government that Mr. Bibbs had any contact with any of the alleged co-conspirators *other than co-defendant Camaron Billips*.") (Emphasis supplied.) Not only is this statement by counsel for Defendant Bibbs legally incorrect – the Sixth Circuit Pattern Jury Instruction 3.03 (Conspiracy) states, among other things, that a conspirator need not know everyone else involved or be member of it from the beginning – it is also factually incorrect. Defendant Bibbs attached Exhibits 1 and 2 to his Motion to Suppress the Search at 510 Gillespie Street (R. 222), in which co-defendant Billips brandished a loaded firearm at police as the police attempted to execute a search warrant at Defendant Bibbs' trap house located at 510 Gillespie. The exhibits to that motion, which include evidence inventory logs of what was found in Defendant Bibbs' trap house, indicate that both Defendant Bibbs and Defendant Billips were in joint possession of various tools of the drug trade (*e.g.*, digital scales, baggies for drug distribution, a firearm). These tools constitute evidence of a drug trafficking conspiracy.

The evidence, as revealed in the Exhibits to Defendant Bibbs' motion in R. 222, show that 510 Gillespie was nothing more than a trap house operated by Defendant Bibbs and Defendant Billips. *United States v. Dixon*, 901 F.3d 1322, 1332 (11th Cir. 2018) (describing

70

"traps" as "locations where members [of the drug trafficking organization] – and only members of the [organization] – sold drugs."); *see also United States v. Welch*, 97 F.3d 142, 150 (6th Cir. 1996) (describing "evidence of conspiracy" as including evidence that the defendant "maintain[ed] along with others crack houses fortified by firearms").

Also found in Defendant Bibbs' trap house, along with Defendant Billips, were scales, Bibbs' driver's license, a loaded firearm (both Bibbs and Billips are felons and, therefore, cannot legally possess firearms or ammunition), $198 cash, as well controlled substances, albeit in small amounts, but including a baggie of heroin prepared for distribution, and paraphernalia used for distributing controlled substances, including plastic baggies. This, too, is evidence of a drug trafficking conspiracy. *See United States v. Forrest*, 17 F.3d 916, 919 (6th Cir. 1994) (describing evidence of a drug trafficking conspiracy found in a house which included a "baggie" of crack, cash, and scales, and that other evidence, including a "laundry ticket" in Forrest's name, suggest that "Forrest had control of the house and therefore possession of the crack"); *United States v. Fudge*, 175 F. App'x 694, 698 (6th Cir. 1996) (describing as the "classic trappings of drug dealing," evidence such as a digital scale, plastic baggies, and "testimony regarding 'unusual visitation patterns' [around Fudge's residence]"); *United States v. Chavez*, 10 F. App'x 426, 427 (9th Cir. 2001) (stating that scales and packaging materials are evidence that can support a finding of a conspiracy to distribute drugs); *United States v. Medina*, 992 F.2d 573, 582 (6th Cir. 1993) ("[E]vidence of possession of firearms is admissible to prove conspiracy to possess with intent to distribute controlled substances because such possession is ostensibly for the purpose of protecting the efficiency of the drug trafficking enterprise."), *abrogated on other grounds by United States v. Jackson-Randolph*, 282 F.3d 369, 389-90; *Jennings v. Rees*, 800 F.2d 72, 75 (6th Cir. 1986) (noting that the loaded firearm "could properly have been treated as evidence…of the crime of drug trafficking" and that the "loaded handgun may fairly be viewed as a tool of the

71

drug trafficker's trade."). The Exhibits offered by Defendant Bibbs show that scales, drugs, baggies in which to package and distribute drugs, cash, and, importantly, a loaded firearm were recovered from Bibbs' trap house – and all of that evidence, as shown in the cases above, is evidence of Defendants Bibbs' and Billips' participation in a drug trafficking conspiracy.

Additionally, Defendant Bibbs' videos and pictures of himself constitute additional evidence of his involvement in this drug trafficking conspiracy generally and proof of his dominion and control over the trap house at 510 Gillespie specifically. *See* R. 167, Government Memorandum in Support of Detention at 8 (photographs of Defendant Bibbs with large quantities of unexplained wealth, including a video wherein he repeats the phrase "we trap, we trap, we trap" while displaying large amounts of cash); *see United States v. Jackson*, No. 94-1173, 1995 U.S. App. LEXIS 6350, *2-3 (6th Cir. 1995) (evidence of Jackson's participation in drug trafficking conspiracy included "a videotape showing Jackson with large sums of money and making references to drugs"); *United States v. Penny*, 60 F.3d 1257, 1263 (7th Cir. 1995) (acknowledging that evidence of unexplained wealth is probative and admissible if it creates an inference of a defendant's involvement in drug trafficking).

Contrary to Defendant Bibbs' claim about a "paucity of proof" (R. 219, Motion at 4), regarding his participation in or connection to this conspiracy, the discovery contains, and the trial in this case will feature, ample evidence of Defendant Bibbs' participation in this drug trafficking conspiracy. Accordingly, since there is no need for a pre-trial hearing to establish Defendant Bibbs involvement in this conspiracy, his motion should be denied.

9. **RESPONSE TO DEFENDANT BIBBS' MOTION FOR SEVERANCE AND MISJOINDER (R. 220, 221)**

Defendant Bibbs' motion for severance and misjoinder[14] is without merit and should be denied. He claims that a joint trial would violate the Confrontation Clause,[15] prevent helpful testimony from co-defendants, and result in "spillover" prejudice, but he fails to cite and apply any law to the facts of his case in support of his position.

*Legal Standard*

Rule 8(b) of the Federal Rules of Criminal Procedure provides:

> **Joinder of defendants.** The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed.R.Crim.P. 8(b).

Under Rule 14(a) of the Federal Rules of Criminal Procedure, a district court may order severance of defendants where it appears joinder prejudices a defendant even though initial joinder was proper under Rule 8.

As the Sixth Circuit has recognized, however, "a strong policy presumption exists in favor of joint trials when charges will be proved by the same evidence and result from the same acts." *United States v. Caver*, 470 F.3d 220, 238 (6th Cir. 2006) (internal quotations omitted);

---

[14] Defendant Antoinette Turner specifically adopts this motion. R. 224. The government's legal position – that the severance and misjoinder motions should be denied – apply with equal force to both defendants.

[15] The government agrees that *Bruton v. United States*, 391 U.S. 123 (1968), presents an initial issue in this case due to the fact that Defendant Bibbs incriminated Defendant Billips in his confession, and Defendant Billips likewise incriminated Defendant Bibbs in his confession. But this issue is remedied via redacted confession transcripts, which the government will provide to the Court for an *in camera* review. The transcripts will seamlessly omit names and pronouns used that would otherwise implicate *Bruton* concerns.

73

*see also Zafiro v. United States*, 506 U.S. 534, 537 (1993) (explaining that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together"). That is so because "[j]oint trials play a vital role in the criminal justice system" by "promot[ing] efficiency and serv[ing] the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro*, 506 U.S. at 537 (internal quotations omitted). "Moreover, the risk of prejudice to defendants in a joint trial is presumably low, because juries are presumed capable of sorting evidence and considering separately each count and each defendant." *Caver*, 470 F.3d at 238 (internal quotations omitted). Thus, it is safe to say that "a defendant seeking severance at trial bears a strong burden and must demonstrate substantial, undue, or compelling prejudice." *Id.* (internal quotations omitted).

If antagonistic defenses are present, to merit severance the defendant must demonstrate substantial, undue, or compelling prejudice, *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992), or that the antagonism will mislead or confuse the jury. *United States v. Weiner,* 988 F.2d 629, 634 (6th Cir. 1993). "A showing that a defendant would have a better chance of acquittal in a separate trial does not establish prejudice requiring severance." *United States v. Warner*, 971 F.2d at 1196. The fact that each defendant might point the finger at the other is not a strong showing of specific and compelling prejudice. These tactics do not necessarily mislead or confuse a jury. *United States v. Logan*, 187 F.3d 639(Table), 1999 WL 551353, at page 15 (6th Cir., July 19, 1999). Thus, a severance is not necessary simply because a defendant thereby might improve his chance at an acquittal or because there may be an alleged "spillover" effect of some of the evidence from one defendant to another. *Id*.

Moreover, the policy in favor of joint trials is strengthened where defendants are charged with participating in the same conspiracy. *United States v. Weiner*, 988 F.2d 629, 634 (6th Cir.

74

1993); *United States v. Goble*, 512 F.2d 458, 465-66 (6th Cir. 1975). While there is always a danger that a jury will convict on the basis of cumulative evidence rather than on the evidence relating to each defendant, it is well settled, as noted above, that "the jury must be presumed capable of sorting out the evidence and considering the case of each defendant." *United States v. Moreno*, 933 F.2d 362, 370 (6th Cir. 1991); *United States v. Paulino*, 935 F.2d 739, 751 (6th Cir. 1991); *United States v. Warner*, 690 F.2d 545, 553 (6th Cir. 1982).

Similarly, a defendant is not entitled to severance because his role in the conspiracy was minor, *United States v. Smolar*, 557 F.2d 13, 21 (1st Cir. 1977), or because the evidence against a co-defendant is more damaging. *United States v. Harris*, 9 F.3d 493, 500-01 (6th Cir. 1993). That evidence may be admissible against one defendant but not others does not require severance, *United States v. Hoffa*, 349 F.2d 20, 43 (6th Cir. 1965), nor is a defendant entitled to severance because the government's proof is stronger against a co-defendant. *United States v. Moore*, 917 F.2d 215, 220 (6th Cir. 1990); *United States v. Williams*, 604 F.2d 1102, 1119 (8th Cir. 1979).

The important public policy reasons for conducting joint trials are overcome only "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. One circumstance where "a joint trial would compromise a specific trial right of one of the defendants" such that severance may be appropriate is where there is a *Bruton* issue. In *Bruton*, the Supreme Court held that "an accused is deprived of his rights under the Confrontation Clause when the confession of a nontestifying codefendant that implicates the accused is introduced into evidence at their joint trial." *United States v. Cope*, 312 F.3d 757, 780-81 (6th Cir. 2002) (citing *Bruton*, 391 U.S. at 137).

75

While it is well-settled that the admission of a co-defendant's post-conspiracy confession implicating the defendant violates the Sixth Amendment's right to confrontation of witnesses under *Bruton*, the rule does not apply to statements made by co-conspirators during and in furtherance of the conspiracy. *See United States v. Kendricks*, 623 F.2d 1165, 1167 (6th Cir. 1980). Courts interpreting *Bruton*, however, have made clear that any Confrontation Clause issue can be eliminated by redacting the non-testifying co-defendant's statement to remove any references to the defendant. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987). As stated above, Defendants Bibbs and Billips implicated each other in their separate *Mirandized* interviews with law enforcement, but the government will prepare transcripts wherein the mutual references to each other's names and pronouns (and even their existence) are seamlessly removed from the transcript and recording. *Gray v. Maryland*, 523 U.S. 185, 192-95 (1998) (observing that "replac[ing] a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify[ing] the jury that name has been deleted" does not eliminate the *Bruton* problem). The Supreme Court later discussed with approval a redacted statement that omitted all reference to the objecting codefendant, as well as any indication that the statement had been redacted. *Id*. at 197 (citing to *Richardson*, 481 U.S. at 203).

### *All Defendants, Including Defendants Bibbs and Antoinette Turner, are Properly Joined*

In this case, all defendants are charged in a poly-drug trafficking conspiracy. Defendants are gang members – or associates of gang members, as in the case of Antoinette Turner – who organized and cooperated with each other to violate the federal drug laws. And particular members of this drug trafficking organization used money laundering to promote continued drug trafficking; indeed, the events revealed on the wiretap on August 1-2, 2019 reveal this fact. "Money laundering is an integral part of a drug enterprise [.]" *United States v. Avery*, 128 F.3d

76

966, 973 (6th Cir. 1997). Moreover, Rule 8(b) does not require that all defendants be charged in all counts. There is no misjoinder of the money laundering count in the Superseding Indictment.

Several defendants, including Defendants Bibbs and Antoinette Turner, are also charged with substantive drug trafficking crimes. Defendant Antoinette Turner, who is the mother of both Alim and Ronald Turner, asserts that her two crack distribution charges (Counts 16 and 17), "bear no factual relationship to the conspiracy in Count One." R. 224, Motion at 1. However, that is not grounds for relief because "severance is not required merely because evidence on one joined count is 'separable and distinct' from evidence of another." *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992) (internal citations omitted). Counts 16 and 17 allege substantive drug trafficking crimes – two controlled crack buys from Defendant Antoinette Turner – that occurred during the same timeframe as the conspiracy in Count One, in which she, her sons, and several others are charged.

### *Antagonistic Defenses and "Spillover" Concerns Do Not Justify Severance*

Defendant Bibbs' argument that evidence of others will convict him by association is without merit. The government believes the jury will have adequate proof, some of which is discussed above, to convict Defendant Bibbs on proof specific to him. Second, alleged "spillover" prejudice is an often invoked but seldom seen basis for relief, because it does not rise to the level of "substantial" or "compelling" prejudice. *Id.* ("A showing that a defendant would have a better chance of acquittal in a separate trial does not establish prejudice requiring severance.") (citing *United States v. Brim*, 630 F.2d 1307, 1310 (8th Cir. 1980)).

Defendant Bibbs vaguely alludes to a co-defendant giving "favorable" testimony at a separate trial. However, the Sixth Circuit has strict rules to employ when a defendant seeks severance in order to obtain a co-defendant's testimony:

The defendant must demonstrate: (1) a bona fide need for the testimony, (2) the substance of the testimony, (3) its exculpatory nature and effect, and (4) that the codefendant will in fact testify if the cases are severed."

*United States v. Causey*, 834 F.2d 1277, 1287 (6th Cir. 1987) (internal citations and quotations omitted). Here, Defendant Bibbs has failed to provide any specific information related to the *Causey* factors. Accordingly, his motion should be denied.

The relevant case law makes clear that defendant's arguments must fail. "[A] defendant seeking severance at trial bears a strong burden and must demonstrate substantial, undue, or compelling prejudice." *Caver*, 470 F.3d at 238. "A showing that a defendant would have a better chance of acquittal in a separate trial does not establish prejudice requiring severance." *United States v. Warner*, 971 F.2d at 1196. The fact that each defendant might point the finger at the other is not a strong showing of specific and compelling prejudice. Such tactics do not necessarily mislead or confuse a jury. *United States v. Logan*, 187 F.3d 639 (Table), 1999 WL 551353, at *15 (6th Cir. July 19, 1999). Thus, a severance is not necessary simply because a defendant thereby might improve his chance at an acquittal or because there may be an alleged "spillover" effect of some of the evidence from one defendant to another. *Id.*

## 10. RESPONSE TO DEFENDANT BIBBS' MOTION TO SUPPRESS SEARCHES OF 510 GILLESPIE STREET (R. 222)

Defendant Bibbs alleges that the state search warrants for the residence located at 510 Gillespie Street violated the Fourth Amendment because, in his view, the drug search warrant was issued without sufficient probable cause, failed to demonstrate a nexus, and used stale information, and the second search warrant, which was issued as a result of the shooting that occurred while law enforcement attempted to execute the first warrant, is allegedly "fruit of the poisonous tree." All of Defendant Bibbs' arguments are without merit and should be denied.

78

Even if the affidavits were in some way defective – they were not – the good-faith exception to the exclusionary rule prevents the evidence from being suppressed from the jury.

### *Two Affidavits Regarding Separate Criminal Activity at 510 Gillespie*

There were two search warrants issued for 510 Gillespie. The first warrant was issued on July 23, 2019 and was based on Officer Headden's affidavit regarding drug trafficking within the residence (the "Headden" affidavit). R. 222-1, Headden affidavit. Given the recent gang violence and drug trafficking connected to 510 Gillespie, as evidenced in the Headden affidavit, Chattanooga SWAT made entry to execute the search warrant. R. 222-2, Ritter affidavit at 2. The search warrant supported by the Headden affidavit was executed on July 25, 2019. Upon entry of 510 Gillespie, Defendant Billips brandished at the SWAT officers a loaded semi-automatic pistol with an extended magazine, which caused the SWAT officers to defend themselves by shooting Billips in the chest. *Id*. at 3. Due to this officer-involved shooting, Detective Ritter sought and received a second search warrant that same day, based on Billips' aggravated assault and attempted homicide crimes, so that law enforcement could enter the residence again and secure the firearm and spent shell casings. *Id*. at 8.

### *Headden Affidavit Demonstrated Non-Stale Probable Cause, Informant Reliability, and Nexus*

At the outset, it should be noted Defendant Bibbs does not allege that the Headden affidavit was facially invalid, as entirely without probable cause, or merely conclusory. Instead, he complains that the affidavit's probable cause articulation was not "sufficient" and that the informant was "not sufficiently" established. R. 222, Motion at 2.

Turning to the Headden affidavit, it established, among other things: the affiant's training and experience, including his experience as police officer since 2011, as well as the role that things such as scales, packaging materials, and records have in drug trafficking. R. 222-1, Headden affidavit at 1. He further explained that, as to the residence at 510 Gillespie:

- a known, proven, and reliable confidential informant (CI) provided information about Defendant Bibbs' drug trafficking at the residence on July 18 and 22, 2019 (*Id*. at ¶¶ 2, 8-9);

- the CI had recently been inside 510 Gillespie and saw Defendant Bibbs dealing heroin and marijuana from the residence and that "within 72 hours of the Judge's signature said informant was on the premises…and saw heroin and marijuana" (*Id*. at ¶¶ 3-4);

- the CI advised that members of a criminal gang who engage in drug trafficking and gun violence associate and congregate at the residence, which was independently corroborated by a law enforcement officer who surveilled the residence July 18, 2019 and saw an undue amount of vehicles and people at the residence (*Id*. at ¶ 5);

- the CI advised that Defendant Bibbs had previously been in federal prison, which was independently corroborated by law enforcement (*Id*. at ¶ 6);

- the CI advised that the residence had been recently shot at on July 21, 2019, which was independently corroborated by a law enforcement who confirmed the CI's information with a police report about the recent shooting and the recovery of shell casings from the front of the residence (*Id*. at ¶ 7);

- the CI, who is known to law enforcement, previously cooperated with law enforcement on prior occasions that resulted in arrests of individuals for drug crimes (*Id*. at ¶¶ 8-9);

- as a result of Headden's affidavit, on July 23, 2019, the judge issued the warrant to search 510 Gillespie and seize, among other items: firearms and ammunition, drugs and drug paraphernalia for packaging, cutting, weighing, and distributing, money, and drug-related records (*Id*. at 5).

The information contained in the Headden affidavit was not stale. In *United States v.*

*Frechette*, 583 F.3d 373 (6th Cir. 2009), the Court identified the four-part staleness test

employed in the Sixth Circuit:

(1) the character of the crime (chance encounter in the night or regenerating conspiracy?),
(2) the criminal conduct (nomadic or entrenched?),
(3) the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?), and
(4) the place to be searched (mere criminal forum of convenience or secure operational base?)

80

*Id.* at 378, citing *United States v. Abboud*, 438 F.3d 554, 572-73 (6th Cir. 2006) (finding that the staleness inquiry is tailored to the specific facts of each case and upholding search warrant for evidence of bank fraud when the fraud occurred three years before the warrant application). The application of these four factors reveal that the information contained in the Headden affidavit was not stale.

1. <u>Character of the crime.</u> The Headden affidavit alleges that Defendant Bibbs was engaged in ongoing criminal activity. R. 222-1, Headden affidavit at ¶¶ 2-3 (alleging that Bibbs "was dealing illegal narcotics, specifically heroin and marijuana, from his residence."). The Sixth Circuit has held that "evidence of ongoing criminal activity will generally defeat a claim of staleness." *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001); *see also*, *United States v. Bryant*, 145 F. App'x 95, 98 (6th Cir. 2005) (rejecting out of hand a staleness argument when a CI "told police that he had been inside Murphy's apartment and had seen cocaine there within the last 72 hours"). This factor weighs against finding the information was stale.

2. <u>The criminal conduct.</u> Paragraph three of the Headden affidavit related that Defendant Bibbs "resid[ed] at 510 Gillespie Road." Accordingly, the information in the affidavit reveals that Defendant Bibbs is not nomadic, but entrenched at the target residence. This factor weighs against finding the information was stale.

3. <u>The things to be seized.</u> The warrant authorized seizure of, among other things, durable goods, such as firearms and ammunition, and electronic devices. *United States v. Pritchett*, 40 F. App'x 901, 906 (6th Cir. 2002) ("Firearms are durable goods that might well be expected to remain in a criminal's possession for a long period of time."). This factor weighs against finding the information was stale.

81

4. <u>The place to be searched.</u> The Headden affidavit demonstrated that the place to be searched was an operational base for Defendant Bibbs to distribute drugs. Moreover, the affidavit further supported that contention by independently verifying the "'unusual visitation patterns' [around Bibbs' residence]." *Fudge*, 175 F. App'x at 698. This factor weighs against finding the information was stale.

In sum, all of the *Frechette* factors weigh in favor of a finding that the information in the Headden affidavit was not stale.

Turning to confidential informant ("CI") reliability, the Headden affidavit informed the magistrate that the CI, who had first-hand observations of the drug trafficking activity inside 510 Gillespie, was known and reliable because the CI had assisted law enforcement in other investigations that led to drug arrests. Despite this CI's reliability demonstrated in the affidavit, law enforcement still undertook additional investigative steps to corroborate the CI, including, verifying the CI's report about Bibbs being a federal felon and the recent shooting at Bibbs' residence, *United States v. Hines*, 885 F.3d 919, 926 (6th Cir. 2018) (stating that suspects' criminal history "provid[es] the issuing judge with further independent corroboration of the informants' leads"), as well as surveilling the residence.

In such cases, the Sixth Circuit has regularly held that extensive law enforcement corroboration of reliable CI is unnecessary. *See, e.g., Butler*, 936 F.3d at 423 ("An affidavit relying solely on an informant's first-hand observations can establish probable cause if the affidavit gives the magistrate sufficient reason to conclude the informant is reliable."); *Hines*, 885 F.3d at 925 ("[G]iven the informants' bases of knowledge, substantial independent police corroboration was unnecessary."); *United States v. Brown*, 732 F.3d 569, 572-74 (6th Cir. 2013) (upholding a search warrant where the only information in the warrant affidavit was the informant's tip that "he had seen cocaine and what he considered to be drug dealing at [the

82

suspect's] house" and information that the informant had given reliable information twice previously); *United States v. Moore*, 661 F.3d 309, 311 (6th Cir. 2011) (finding probable cause where the warrant affidavit said only that the detective spoke "with a reliable informant who has given information in the past in regards to narcotics trafficking," who "stated that he/she ha[d] been at the above described residence within the past five … days … and ha[d] seen [an individual] storing and selling cocaine [there]"); *United States v. Smith*, 182 F.3d 473, 483 (6th Cir. 1999) ("Although either richness of detail or heightened level of corroboration may be required where information is provided by an anonymous informant of unknown veracity, information supplied by an informant of proven reliability may be sufficient, standing alone, to demonstrate probable cause."); *United States v. Finch*, 998 F.2d 349, 352 (6th Cir. 1993) (approving an affidavit that showed a "reliable informant," who had previously provided accurate information leading to drug enforcement actions, saw "within the past 5 days" evidence of drug trafficking inside the above described residence). Here, the CI was known, reliable, and, though not necessary, the CI was corroborated by additional law enforcement investigation – all of which was included in the Headden affidavit.

Contrary to Defendant Bibbs' claim as to lack of nexus, the Headden affidavit demonstrated a nexus between the drug trafficking observed first-hand by the CI inside Defendant Bibbs' trap house at 510 Gillespie, and the place to be searched, namely, that same trap house which Defendant Bibbs maintained. Such direct evidence of nexus by a reliable CI in this affidavit is sufficient, especially when contrasted with the affidavit rejected by the Sixth Circuit in *United States v. Brown*, 828 F.3d 375 (6th Cir. 2016). Indeed, part of the problem with the affidavit's nexus in *Brown* was that the affidavit in that case did not provide any facts that the defendant "distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there." *Id.* at 382. Conversely, the Headden affidavit states

83

that Defendant Bibbs resided at 510 Gillespie, that he was actively storing and dealing drugs from there, and that there was recent suspicious (and violent) activity there, all of which had been observed first-hand by the CI within the last 72-hours. The Headden affidavit established a sufficient nexus.

Defendant Bibbs' passing reference to *Wong Sun* is inapplicable on the facts of this case. R. 222 at 3. As shown above, because the Headden affidavit provided ample, non-stale probable cause and established a nexus, the Chattanooga SWAT team was authorized to enter 510 Gillespie pursuant to a valid search warrant. Then, once SWAT entered, Defendant Billips committed several serious felonies by brandishing a loaded firearm at the officers as they made entry. For probable cause purposes, the Ritter affidavit, outside of the training/experience paragraphs, uses only those two essential facts: (1) SWAT's legal entry with a valid search warrant, which allowed the SWAT officers to enter 510 Gillespie, and then Billips' criminal activity inside 510 Gillespie against the SWAT officers. This fact is further supported by the Ritter affidavit's items to be seized (*e.g.*, firearms, hairs, fibers, blood splatter, bodily fluids, etc.), all of which was related to Defendant Billips' attempted criminal homicide and aggravated assault against the SWAT officers. Accordingly, *Wong Sun* is the wrong case and has no applicability to the searches conducted at 510 Gillespie on July 25, 2019.

An evidentiary hearing is not needed to resolve this suppression motion. *See Dyer*, 580 F.3d at 390 ("In reviewing the sufficiency of the evidence supporting probable cause, we are limited to examining the information contained within the four corners of the affidavit").

### *The Good Faith Exception Applies*

Even if the Court were to find that the affidavit in support of the search warrant for the residence at 510 Gillespie was defective, either due to lack of probable cause or nexus, suppression is not an appropriate remedy because there is no officer misconduct present in this

case that the extreme remedy of suppression would deter. *Herring*, 555 U.S. at 144. In other words, the good faith exception applies to both of these search warrants, and the United States specifically invokes and incorporates the same good faith arguments it made above in response to Defendant Ushery Stewart's motion to suppress (R. 191, Motion) regarding the federal search warrant executed at 301 Lippencott.

## 11. RESPONSE TO DEFENDANT BIBBS' MOTION TO SUPPRESS STATEMENTS (R. 223)

As an initial matter, Defendant Bibbs' motion appears to give the impression that law enforcement never advised Bibbs of his *Miranda* warnings at any time on July 25, 2019 – such an impression is wrong. Defendant Bibbs was interviewed twice by law enforcement on July 25, 2019, and he made voluntary admissions during both interviews. Assuming Defendant Bibbs' watched the video of the second interrogation he references in his motion (R. 223, Motion at 2, ¶ 4), he would have seen and heard that the Hamilton County Sheriff's Office (HCSO) personnel, in a clear, professional manner, provided Defendant Bibbs with his *Miranda* warnings before asking him any questions. A sealed transcript of that interrogation has been submitted as an exhibit to this response.[16]

### *First interrogation: 8:02 am in a Police Cruiser at 510 Gillespie*

This interrogation lasted for approximately 8 minutes, from approximately 8:02am – approximately 8:10am, on July 25, 2019. The purpose of the questioning related to the recent shooting inside 510 Gillespie. The United States agrees with Defendant Bibbs that he was subjected to custodial interrogation without *Miranda* while he was in the cruiser following the shooting inside 510 Gillespie earlier that morning. *Miranda* warnings are triggered only when a

---

[16] The transcript is sealed because it is the United States' proposed transcript that addresses *Bruton* issues raised by the incriminating statements Defendant Bibbs made about Defendant Billips.

85

defendant is "in custody" and subject to "interrogation." *Miranda v. Arizona*, 384 U.S. 436 (1966). Accordingly, the United States will not use in its case-in-chief the statement Defendant Bibbs made while seated in the cruiser.

However, though un-*Mirandized*, Defendant Bibbs' voluntary statements made in the cruiser may be used for rebuttal and to impeach him should he choose to waive his Fifth Amendment right against self-incrimination and testify at trial. In *Harris v. New York*, 401 U.S. 222 (1971), the Supreme Court held that, "[E]very criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury." The Supreme Court further stated that "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by the use of his earlier conflicted [yet voluntary] statements." *Id.* at 226. In other words, if Defendant Bibbs chooses to testify at trial and his testimony is inconsistent with his unwarned, voluntary, custodial statements while he sat in the cruiser, then the prior statements are admissible to impeach his credibility. *Id.* at 225.

### *Second Interrogation:   10:42pm at HCSO*

This interrogation lasted for approximately 11 minutes, from approximately 10:42pm – approximately 10:53pm on July 25, 2019. This second interrogation occurred approximately 10 hours after the first interrogation. Additionally, this interrogation differed from the first interrogation in that it occurred at a different location, was conducted by different law enforcement personnel, and focused on drug trafficking, as opposed to the attempted criminal homicide of police officers at 510 Gillespie. Another key difference between the two interrogations is that Defendant Bibbs was read his *Miranda* warnings prior to any questioning. Defendant Bibbs' behavior and his words indicated that he both understood his rights and that he

86

knowingly and intelligently waived those rights by talking to law enforcement and asking them

questions, as evidenced in the partial transcript below with relevant waiver language in bold:

> HCSO:   **We want to ask you some questions. If you want to, I got to let you know about your rights because you are in custody. Ok?**
>
> DB:   Alright.
>
> HCSO:   **Ok, alright. Before we ask you any questions, you must understand you rights. Alright. You have the right to remain silent. Ok? Anything you say can be used against you in court. Ok? You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. Ok? If you can't afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present you still have the right at any time to stop the questioning. Ok? You also have the right to stop answering me at any time until you talk to a lawyer for advice. Ok? Um, just get, do you, do you want to talk to us right now?**
>
> DB:   **What's my charges? What I'm charged with?**
>
> HCSO:   **There's going to be some drug, drug charges.**
>
> DB:   Drug charges?
>
> HCSO:   Yeah, that's what we would like to talk to you about. See your side of the story and everything. Ok?
>
> DB:   Maaaan –
>
> HCSO:   I know, it sucks, man.
>
> DB:   **Drugs – what's the drug charges? What, what, what ya'll done found –**
>
> HCSO:   We're gonna go into that here in a second. We need to know if you want to talk –
>
> DB:   What's up y'all? What's up? **I wanna know what ya'll, what ya'll talkin' 'bout.**
>
> HCSO:   Ok. Do you, do you want to talk to us? **Do you understand what your rights are?**
>
> DB:   **Man, I'm tryin' to see what ya'll found in this house.**
>
> HCSO:   Ok.
>
> . . .

HCSO:    Alright. **Do you want to sign the waiver form?** That you want to talk to us?

DB:    **Man, I ain't signin' nothin', man.**

HCSO:    **That's fine. Do you want to talk to us?**

DB:    Then ya'll, ya'll, how ya'll gonna kick the door in like that, man?

HCSO:    Hold on just a second, listen.

DB:    **Yeah, I'm finna talk. I'm finna, I'm finna see what goin' on. I wanna know what's goin' on. Yeah. I wanna know what's goin' on, man.**

HCSO:    I work narcotics for the sheriff's office.    He works criminal investigations for the sheriff's office.

DB:    Yeah.

HCSO:    You gonna listen?

DB:    Yeah, yeah I'm finna to, I'm finna to see what's goin' on.

HCSO:    Ok.    Do you, do you –

DB:    **Man, come on with the questions, man. Just come on with the questions, bruh.**

Exs. 9 & 9a, SEALED, Redacted Transcript and Video of 7-25-19 HCSO Bibbs interview.

As shown in the partial transcript above, Defendant Bibbs understood his rights and

persistently manifested a desire to talk to the police so that he could attempt to ascertain the

nature of their case against him, despite his refusal to sign the rights waiver. However, Defendant

Bibbs' refusal to sign the rights waiver is not a bar to the United States using in its case-in-chief

all of his voluntary statements made during this interview, because he made them after

knowingly and intelligently waiving his *Miranda* rights. *Davie v. Mitchell*, 547 F.3d 297, 306-07

(6th Cir. 2008) ("[N]o *Miranda* violation in a case, like this one, where the defendant had

refused to sign a waiver form but freely spoke to police after being advised of his *Miranda*

rights."). This is known as the implied waiver doctrine. Implied waiver is sufficient when the

defendant has "evinced a willingness and a desire for a generalized discussion about the

investigation." *Id.* at 304 (citing *Oregon v. Bradshaw*, 462 U.S. 1039 (1983); *see also*, *United States v. Whaley*, 13 F.3d 963 (6th Cir. 1994) (stating that generally waiver occurs "when, without influence by the authorities, the suspect shows a willingness and a desire to talk generally about his case."). There is no Fifth Amendment violation because Defendant Bibbs knowingly and intelligently waived, impliedly, his *Miranda* warnings before answering any questions. Accordingly, his voluntary statement is admissible against him at trial.

### 12. RESPONSE TO DEFENDANTS' MOTIONS FOR PRETRIAL NOTICE OF GOVERNMENT'S INTENT TO USE 404(b) EVIDENCE (R. 184, 216, 206, 224)

Defendants have collectively moved the Court to order the government to provide varying degrees of advanced notice prior to trial of any evidence sought to be introduced under Fed. R. Evid. 404(b). On September 5, 2019, this Court entered an order which provided in pertinent part as follows:

> Upon request, the government shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any Rule 404(b)-type evidence it intends to introduce at trial. Unless otherwise ordered by the Court "reasonable notice" shall be deemed to be seven (7) calendar days before trial.

R. 11, Order on Discovery and Scheduling at 3 ¶ I. Defendant Ronald Turner seeks this relief "[b]ased on the unique facts of this case[]", (R. 184, Motion at 1), but Defendant Turner does not elaborate on what precisely the "unique facts" of this case are or why – considering that this case is a typical drugs/money/guns case – such facts demand a deviation from the Court's Order on Discovery and Scheduling. Defendant Ronald Turner has shown no cause to extend this period and his motion should be denied. Moreover, Defendants Prater and Bibbs likewise make no attempt to show why the Court should deviate from its Scheduling Order.

Defendant Ronald Turner additionally asks the "Court to enter an Order prohibiting the introduction of 'other acts' evidence through direct testimony or cross-examination [until the

Court deems it admissible]." *Id.* at 1-2. As Count One of the Superseding Indictment reveals,

Defendant Ronald Turner is charged with 11 other co-defendants in a conspiracy to distribute

controlled substances. Accordingly, the United States will be presenting evidence of Defendant

Ronald Turner's participation in that conspiracy, evidence which will show him to be a

leader/organizer within the conspiracy. Additionally, as stated above and in accordance with the

Court's Order, the United States will provide reasonable notice to defendants of any Fed. R.

Evid. 404(b)-type evidence.

Additionally, the United States will be guided by the Sixth Circuit's decision on the subject

of intrinsic acts evidence. *United States v. Edmond*, 815 F.3d 1032 (6th Cir. 2016), succinctly

provides the Sixth Circuit's view on what is commonly called "intrinsic acts" evidence. In

affirming the district court's admission of a December 2010 uncharged shooting as intrinsic acts

evidence, the Sixth Circuit explained:

> A district court may admit uncharged background evidence as long as it is "inextricably intertwined" with the underlying offense. *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000). This theory of admission goes by many, maybe too many, names: res gestae, background evidence, intrinsic acts, intrinsic evidence. *See United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015). No matter the name (we prefer "intrinsic acts"), the idea is the same: Intrinsic acts "are part of a single criminal episode," *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995), meaning they "ha[ve] a causal, temporal or spatial connection with the charged offense," *Hardy*, 228 F.3d at 748. Courts may admit evidence via this route if it (1) "is a prelude to the charged offense"; (2) "is directly probative of the charged offense"; (3) "arises from the same events as the charged offense"; (4) "forms an integral part of a witness's testimony"; or (5) "completes the story of the charged offense." *Id.* . . . Intrinsic acts may be admitted when evidence "provides background information, establishes a nexus between individuals, or completes the story of the charged offense." *United States v. Gibbs*, 797 F.3d 416, 434 (6th Cir. 2015). The December 2010 shooting does all of that and then some.

*Edmond*, 815 F.3d at 1045-46.

## CONCLUSION

For all of the above reasons, the United States respectfully requests that the Court deny all of defendants' motions.

Respectfully submitted,

J. DOUGLAS OVERBEY
UNITED STATES ATTORNEY

By: *s/ David P. Lewen, Jr.*
   David P. Lewen, Jr.
   Assistant United States Attorneys
   800 Market Street, Suite211
   Knoxville, Tennessee 37902
   865.545.4167

By: */s/ Kevin S. Quencer*
   Kevin S. Quencer (VA BAR #77212)
   Assistant United States Attorney
   800 Market Street, Suite 211
   Knoxville, Tennessee 37902
   (865) 545-4167
   Kevin.quencer@usdoj.gov